No. 24-1773

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

REAL TIME MEDICAL SYSTEMS, INC.,

*Plaintiff-Appellee,*

*v.*

POINTCLICKCARE TECHNOLOGIES, INC. D/B/A POINTCLICKCARE,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Maryland at Greenbelt

BRIEF FOR *AMICI CURIAE* ELECTRONIC HEALTH
RECORD ASSOCIATION AND AMERICAN HOSPITAL
ASSOCIATION IN SUPPORT OF DEFENDANT-
APPELLANT AND REVERSAL

> James E. Tysse
> Kelly M. Cleary
> Margaret O. Rusconi
> Emily I. Gerry
> Stephanie Ondroff
> AKIN GUMP STRAUSS
>   HAUER & FELD LLP
> 2001 K Street N.W.
> Washington, D.C. 20006
> 202-887-4000
> jtysse@akingump.com
>
> *Counsel for* Amici Curiae

# DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by all parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)

- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.

- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)

- Any corporate amicus curiae must file a disclosure statement.

- Counsel has a continuing duty to update the disclosure statement.

No. 24-1773                    Caption: Real Time Medical Systems, Inc. v. PointClickCare Technologies, Inc.

Pursuant to FRAP 26.1 and Local Rule 26.1, the Electronic Health Record Association and American Hospital Association, who are *amici curiae*, make the following disclosure:

1. Is party/amicus a publicly held corporation or other publicly held entity?

                              ____YES     [X] NO

2. Does party/amicus have any parent corporations?

                              ____YES     [X] NO

   If yes, identify all parent corporations, including all generations of parent corporations: Neither *amici curiae* has a parent corporation. The Electronic Health Record Association is a professional community within the Healthcare Information and Management Systems Society, a non-profit organization that has no parent corporation.

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

____YES    [X] NO

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

____YES    [X] NO

If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)

____YES ____ NO

If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?

____YES    [X] NO

If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?

____YES    [X] NO

If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature:  _s/ James E. Tysse_          Date:     _September 23, 2024_

Counsel for:  _Amici curiae_

**TABLE OF CONTENTS**

STATEMENT OF INTEREST OF AMICI CURIAE ............................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 4

ARGUMENT ..................................................................... 7

I.    PRIVATE PARTIES CANNOT USE STATE COMMON LAW
    TO CIRCUMVENT CONGRESS'S DECISION TO
    DISALLOW PRIVATE ENFORCEMENT OF THE CURES
    ACT .......................................................................... 7

        A.    There Is No Private Cause Of Action To Enforce The
            Cures Act's "Information Blocking" Prohibition.................... 7

        B.    Allowing A Common Law Claim Based Solely On A
            Purported "Information Blocking" Violation Would
            Interfere With Congress's Chosen Enforcement
            Scheme .............................................................. 11

II.    A CURES ACT "INFORMATION BLOCKING" VIOLATION,
    STANDING ALONE, CANNOT SUFFICE TO STATE A
    CLAIM UNDER MARYLAND COMMON LAW. .......................... 24

CONCLUSION ................................................................ 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. Sandoval,*
532 U.S. 275 (2001) ............................................................ 10

*Ameritox, Ltd. v. Millennium Lab'ys, Inc.,*
803 F.3d 518 (11th Cir. 2015) ........................................... 30

*Arizona v. United States,*
567 U.S. 387 (2012) ........................................ 14, 15, 21, 23

*Armstrong v. Exceptional Child Ctr., Inc.,*
575 U.S. 320 (2015) ............................................................. 7

*Astra USA, Inc. v. Santa Clara Cnty.,*
563 U.S. 110 (2011) ..................................................... 15, 20

*BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def.*
*Acquisition Program Admin.,*
884 F.3d 463 (4th Cir. 2018) ............................................ 23

*Bagelmann v. First Nat'l Bank,*
823 N.W.2d 18 (Iowa 2012) ............................................. 25

*Baltimore Bedding Corp. v. Moses,*
34 A.2d 338 (Md. Ct. App. 1943) ..................................... 26

*Bauer v. Elrich,*
8 F.4th 291 (4th Cir. 2021) ......................................... 12, 15

*Berlyn, Inc. v. The Gazette Newspapers, Inc.,*
157 F. Supp. 2d 609 (D. Md. 2001) .................................. 28

*Brass Metal Prod., Inc. v. E-J Enterprises, Inc.,*
984 A.2d 361 (Md. Ct. Spec. App. 2009) .......................... 29

*Buckman Co. v. Plaintiffs' Legal Committee*,
    531 U.S. 341 (2001) ........................................................ 13, 14

*Cannon v. University of Chicago*,
    441 U.S. 677 (1979) ................................................................ 7

*College Loan Corp. v. SLM Corp.*,
    396 F.3d 588 (4th Cir. 2005) ......................................... 14, 16

*Conboy v. AT&T Corp.*,
    241 F.3d 242 (2d Cir. 2001) ................................................. 27

*DiCroce v. McNeil Nutritionals, LLC*,
    82 F.4th 35 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 1382
    (2024) .................................................................................... 14

*DP-Tek, Inc. v. AT&T Glob. Info. Sols. Co.*,
    100 F.3d 828 (10th Cir. 1996) ............................................. 29

*Electronics Store, Inc. v. Cellco P'ship*,
    732 A.2d 980 (Md. Ct. Spec. App. 1999) ........................... 26

*Farina v. Nokia Inc.*,
    625 F.3d 97 (3d Cir. 2010) ................................................... 19

*GAI Audio of New York, Inc. v. Columbia Broad. Sys. Inc.*,
    340 A.2d 736 (Md. Ct. Spec. App. 1975) ........................... 26

*Gonzaga Univ. v. Doe*,
    536 U.S. 273 (2002) ................................................................ 7

*Guthrie v. PHH Mortg. Corp.*,
    79 F.4th 328 (4th Cir. 2023) ............................................... 15

*Highmark Fed. Credit Union v. Hunter*,
    814 N.W.2d 413 (S.D. 2012) ............................................... 25

*Intus Care, Inc. v. RTZ Assoc., Inc.*,
    No. 24-CV-1132, 2024 WL 2868519 (N.D. Cal. June 5,
    2024) .................................................................................... 28

*Malden Transp., Inc. v. Uber Techs., Inc.*,
  386 F. Supp. 3d 96 (D. Mass. 2019).....................................28

*Martin Marietta Corp. v. Gould, Inc.*,
  70 F.3d 768 (4th Cir. 1995)..............................................30

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996)......................................................14

*Merrick Bank Corp. v. Valley Nat'l Bank*,
  No. CV 13-7756, 2017 WL 5951583 (D.N.J. Nov. 30, 2017)..............25

*Motor Coach Emps. v. Lockridge*,
  403 U.S. 274 (1971)......................................................15

*National Found. for Cancer Rsch., Inc. v. Council of Better
  Bus. Bureaus, Inc.*,
  705 F.2d 98 (4th Cir. 1983).............................................24

*Northwest Airlines, Inc. v. Transport Workers Union of Am.,
  AFL-CIO*,
  451 U.S. 77 (1981)......................................................10

*Patel v. Catamaran Health Sols., LLC*,
  No. 15-CV-61891, 2016 WL 5942475 (S.D. Fla. Jan. 14,
  2016)....................................................................25

*Payne v. Taslimi*,
  998 F.3d 648 (4th Cir. 2021)............................................10

*Perez v. Nidek Co.*,
  711 F.3d 1109 (9th Cir. 2013)........................................13, 14

*Raab v. Smith & Nephew, Inc.*,
  150 F. Supp. 3d 671 (S.D.W. Va. 2015)..................................14

*Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*,
  No. 04-02-00188, 2003 WL 21972724 (Tex. Ct. App. Aug.
  20, 2003)............................................................12, 24

iv

*Riley v. St. Luke's Episcopal Hosp.*,
  252 F.3d 749 (5th Cir. 2001)............................................................21

*Sprunger v. Egli*,
  44 N.E.3d 690 (Ind. Ct. App. 2015) ...............................................25

*Stenberg v. Carhart*,
  530 U.S. 914 (2000)........................................................................24

*Thermal Design, Inc. v. American Soc'y of Heating,*
  *Refrigerating & Air-Conditioning Eng'rs, Inc.*,
  No. 7-C-765, 2008 WL 1902010 (E.D. Wisc. Apr. 25, 2008)..............27

*Touche Ross & Co. v. Redington*,
  442 U.S. 560 (1979) ..........................................................................7

*Transamerica Mortg. Advisors, Inc. v. Lewis*,
  444 U.S. 11 (1979) ..........................................................................11

*Vilcek v. Uber USA, LLC*,
  902 F.3d 815 (8th Cir. 2018)...........................................................29

*Waypoint Mgmt. Consulting, LLC v. Krone*,
  No. CV ELH-19-2988, 2022 WL 2528465 (D. Md. July 6,
  2022).................................................................................................26

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
  475 U.S. 282 (1986)..................................................................14, 23

*Ziglar v. Abbasi*,
  582 U.S. 120 (2017) ..........................................................................7

**Statutes**

8 U.S.C.
  § 1621 ..............................................................................................12

15 U.S.C.
  § 26 ..................................................................................................28

42 U.S.C.

§ 300jj-52(a) ........................................................................ 16
§ 300jj-52(a)(1) ..................................................................... 8
§ 300jj-52(a)(2) ..................................................................... 8
§ 300jj-52(a)(3) ..................................................................... 8
§ 300jj-52(a)(5) ..................................................................... 8
§ 300jj-52(a)(7) ..................................................................... 9
§ 300jj-52(b)(1) ................................................................. 9, 16
§ 300jj-52(b)(2) ................................................................... 16
§ 300jj-52(b)(2)(A) ........................................................ 10, 22
§ 300jj-52(b)(2)(B) .......................................................... 9, 22
§ 300jj-52(b)(2)(D) ........................................................ 10, 22
§ 300jj-52(b)(3)(A) ............................................................. 9
§ 300jj-52(b)(3)(B) ............................................................. 9
§ 300jj-52(d)(3) ........................................................ 8, 16, 22
§ 300jj-52(d)(4) .......................................................... 10, 23

2009 Health Information Technology for Economic and
Clinical Health ("HITECH") Act, Pub. L. No. 111-5 ........................ 17

Md. Code Ann., Cts. & Jud. Proc. § 12-603 ..................................... 30

Pub. L. No. 114-255 ............................................................ 4

**Rules and Regulations**

45 C.F.R. Part 170 ............................................................ 17

42 C.F.R. § 414.1375(b) ................................................... 17, 18

42 C.F.R. § 495.40 ....................................................... 17, 18

45 C.F.R. § 170.401 .......................................................... 18

45 C.F.R. § 170.402(a)(1) .................................................... 18

45 C.F.R. § 170.406(a)(1) .................................................... 18

Fed. R. App. P. 29(a)(4)(E) ................................................... 1

Md. Rule 8-305 .............................................................. 30

**Other Authorities**

Stephen B. Burbank et al., *Private Enforcement of Statutory and Administrative Law in the United States (and Other Common Law Countries)* (All Faculty Scholarship, Paper No. 357, 2014) ............................................................. 20, 21

CMS, *Merit-Based Incentive Payment System (MIPS) Eligible Clinicians, and Eligible Hospitals and Critical Access Hospitals in the Medicare Promoting Interoperability Program*, 89 Fed. Reg. 8,758 (Feb. 8, 2024) ................................................................................ 17

*Grants, Contracts, and Other Agreements: Fraud and Abuse; Information Blocking; Office of Inspector General's Civil Money Penalty Rules*, 88 Fed. Reg. 42,820 (July 3, 2023) ................. 16

ONC, *Report on Health Information Blocking* (Apr. 2015) .................... 19

Restatement of Law (Third) of Unfair Competition, § 1 (1995) ................................................................................ 27

U.S. Const. art. VI, cl. 2 ........................................................ 12

## STATEMENT OF INTEREST OF AMICI CURIAE[1]

The Electronic Health Record Association and American Hospital Association submit this brief as *amici curiae* in support of Defendant-Appellant PointClickCare Technologies, Inc. ("PointClickCare").

The **Electronic Health Record Association** ("EHR Association") is an advocacy group, established in 2004, that operates as a subject-matter-focused professional community within the Healthcare Information and Management Systems Society, or HIMSS. The EHR Association represents 29 companies that develop and supply electronic health record software used by the vast majority of physicians' practices and hospitals across the United States, including within Maryland, and that all offer one or more software products certified by the Department of Health and Human Services ("HHS") Assistant Secretary for Technology Policy/Office of the National Coordinator for Health Information Technology. The EHR Association operates on the premise that the adoption of electronic health records is essential to improve the

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amici* state that no party's counsel has authored this brief in whole or in part, and that no party, party's counsel, or person (other than *amici curiae*, their members, and their counsel) made any monetary contribution intended to fund the preparation or submission of this brief.

1

quality of patient care, as well as the productivity and sustainability of the healthcare system.  As part of its mission, the EHR Association routinely provides testimony, comments on proposed regulations, and education to legislators and policymakers related to electronic health records policy.

The **American Hospital Association** ("AHA") represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations, including within Maryland.  Founded in 1898, the AHA educates its members on healthcare issues and advocates on their behalf so that their perspectives are heard and addressed in national health policy development, legislative and regulatory debates, and judicial matters. Its members are committed to making critical health information available to patients, the clinicians treating those patients, and those with appropriate reasons for having access to health information, among which are payment, care oversight, and research.  The AHA regularly files *amicus* briefs and engages in other advocacy efforts to support the interests of physicians and hospitals nationwide.

*Amici* have for years worked with their members and HHS on the issue of "information blocking."  Since the 21st Century Cures Act and its

information blocking prohibition became law, *amici* have provided comments on HHS rules proposed to help implement the prohibition. *Amici* have also worked to ensure their members are prepared for any HHS enforcement efforts.

The decision of the Maryland district court below, however, threatens to open a new front of information blocking enforcement that no one—not even Congress—could have anticipated. Specifically, the district court concluded that, although the Cures Act provides no private cause of action, Plaintiff Real Time Medical Systems, Inc. ("Real Time") can proceed with a state-law claim premised entirely on the Act's information blocking prohibition. This conclusion is wrong; only HHS can enforce the Cures Act's information blocking prohibition. *Amici* submit this brief to explain how permitting state common law claims based solely on an alleged information blocking violation would interfere with Congress's carefully crafted enforcement scheme, and why such claims are inconsistent with Maryland common law regardless.

3

## INTRODUCTION AND SUMMARY OF ARGUMENT

For the better part of the last two decades, the healthcare sector generally—and *amici* and their members specifically—have worked to improve healthcare quality, safety, and efficiency through the adoption of health information technology ("IT").  In 2016, facing complaints that some actors in the health IT space interfered with the exchange of health information, Congress passed the 21st Century Cures Act ("Cures Act"), which authorized HHS to investigate and penalize the practice of "information blocking."  Pub. L. No. 114-255.

Notably, the Cures Act does not provide for any private enforcement of this information blocking prohibition.  The Cures Act requires HHS to provide a standardized process for the general public to report claims of information blocking.  But the decision whether to investigate any claim and pursue any enforcement action is left to HHS's sole discretion.  There is no private cause of action.

The district court's decision, however, offers competitors and other private parties the chance to bypass HHS entirely—and to take information blocking enforcement into their own hands.  In granting Real Time's motion for a preliminary injunction, the district court allowed

Real Time to proceed with—and even found that the company was "likely to succeed on"—a Maryland common law claim that, "[a]t its core," alleges conduct that "amounts to 'information blocking' of protected patient medical records in violation of the 21st Century Cares Act." JA1007. If the decision is upheld, private parties in this Circuit will have the ability to commandeer state law to bring what amounts to an "information blocking" claim in all but name.

The district court's holding was contrary to law. Allowing state common law claims based solely on an alleged information blocking violation would interfere with federal law. The Cures Act and its implementing regulations set out a complex, comprehensive administrative enforcement scheme in a technical area of law that makes HHS the sole enforcer. If competitors or other aggrieved parties could bring state-law claims of information blocking in state court, Congress's decision to deny private parties a cause of action would be meaningless. It would also frustrate HHS's ability to administer the scheme and create nationwide inconsistencies leading to significant uncertainty for regulated entities. This uncertainty poses a problem for all actors regulated by the Cures Act, including both developers of certified health

IT (like the EHR Association's members) and healthcare providers (like AHA's members).

But there is no need to discern such a conflict (or opine on Supremacy Clause issues) because there is no reason to think Maryland would countenance such a conflict with federal law. Instead, Maryland courts would almost surely refuse to allow private parties to commandeer state law to pursue violations of federal law after Congress declined to provide them with a private cause of action. *Amici* are aware of no Maryland case that does. Indeed, state courts around the country typically refuse to allow a common law cause of action based on a statute that has no private cause of action.

The key point is that, even if the conduct underlying a claim of alleged information blocking could establish the elements of a Maryland common law tort, the district court should have analyzed that conduct in light of Maryland law and precedent. What the court plainly should *not* have done is find that an alleged statutory violation of the federal Cures Act, without more, constituted a *per se* violation of Maryland law.

This Court should reverse and remand for further proceedings.

## ARGUMENT

I. **PRIVATE PARTIES CANNOT USE STATE COMMON LAW TO CIRCUMVENT CONGRESS'S DECISION TO DISALLOW PRIVATE ENFORCEMENT OF THE CURES ACT**

A. **There Is No Private Cause Of Action To Enforce The Cures Act's "Information Blocking" Prohibition.**

No one argues that the Cures Act or its implementing regulations provide a private cause of action. Nor could they. When "a federal statute has been violated and some person harmed," there is "not automatically *** a private cause of action in favor of that person." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 688 (1979)). Rather, "[a] private right of action under federal law *** must be 'unambiguously conferred'" by Congress. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 332 (2015) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002)). Thus, "the 'determinative' question is one of statutory intent." *Ziglar v. Abbasi*, 582 U.S. 120, 133 (2017). "If the statute itself does not display an intent to create a private remedy, then a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* (quotation marks and alteration omitted).

7

The Cures Act reveals no intent to create any private "right" or "remedy." Quite the opposite, the Act's detailed enforcement scheme makes clear that HHS—and HHS alone—has the right to pursue enforcement of statutory violations. First, although the Act affirmatively defines the practice of information blocking and gives examples of what information blocking "may include," 42 U.S.C. § 300jj-52(a)(1)-(2), it requires the Secretary of HHS to identify (in consultation with the Federal Trade Commission to the extent necessary) what "reasonable and necessary" activities should *not* be considered information blocking, *id.* § 300jj-52(a)(3), (5).

Second, the Act requires HHS's National Coordinator of Health IT to implement (i) a process for the public to submit reports of instances of information blocking and (ii) a process to collect information from those reports, including "the originating institution, location, type of transaction, system and version, timestamp, terminating institution, locations, system and version, failure notice, and other related information." 42 U.S.C. § 300jj-52(d)(3).

Third, the Act provides that HHS's Inspector General may investigate any claims of information blocking and may refer claims

8

related to the Health Insurance Portability and Accountability Act ("HIPAA") to HHS's Office of Civil Rights. *See* 42 U.S.C. § 300jj-52(b)(1), (b)(3)(A). If a healthcare provider or health IT developer "makes information available based on a good faith reliance on consultations with the [Office of Civil Rights]," the provider or developer "shall not be liable for such disclosure or disclosures made pursuant to" that referral. *Id.* § 300jj-52(b)(3)(B). The Secretary of HHS also must "ensure that health care providers are not penalized for the failure of developers of health [IT] or other entities offering health [IT] to such providers to ensure that such technology meets the requirements to be certified" by the agency. *Id.* § 300jj-52(a)(7).

Fourth, the statute gives the Inspector General a range of options if the Inspector General determines that information blocking has occurred, depending on who is found to have committed the violation. The Act requires the Inspector General to refer any healthcare provider found "to have committed information blocking *** to the appropriate agency to be subject to appropriate disincentives[.]" 42 U.S.C. § 300jj-52(b)(2)(B). The Act separately authorizes the Inspector General to impose civil monetary penalties up to $1 million against health IT

9

developers, networks, and exchanges found to have committed the practice. *Id.* § 300jj-52(b)(2)(A). But the Act requires the HHS Secretary to ensure that entities found to have engaged in information blocking are not subject to duplicative penalties to the extent possible. *Id.* § 300jj-52(d)(4).

Finally, the Office of the Inspector General may use any recovered penalties to fund the Office's further information blocking investigations. 42 U.S.C. § 300jj-52(b)(2)(D).

What this detailed and comprehensive statutory scheme demonstrates is that no provision supplies a private cause of action to anyone. Nor does the scheme imply one. On the contrary, such a complex administrative enforcement scheme "reflect[s] Congress's intent to *forgo* creating a private remedy." *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021) (emphasis added); *see Northwest Airlines, Inc. v. Transport Workers Union of Am., AFL-CIO*, 451 U.S. 77, 97 (1981) ("The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."); *see also Alexander v. Sandoval*, 532 U.S. 275, 290 (2001) ("The express

provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.").  Put simply, the above provisions show plainly that Congress wanted information blocking claims to be channeled through HHS—not "enforced through private litigation." *Transamerica Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 18 (1979).

### B. Allowing A Common Law Claim Based Solely On A Purported "Information Blocking" Violation Would Interfere With Congress's Chosen Enforcement Scheme.

The district court seemed to recognize that the Cures Act does not provide any private right of enforcement.  *See* JA1007.  But it effectively undermined that finding by holding that Real Time could proceed on a Maryland common law claim that, "[a]t its core," challenged conduct that "amounts to 'information blocking' of protected patient medical records in violation of the 21st Century Cares Act."  *Id.*; *see* JA1007-1015.  That holding not only rests on a misreading of Maryland law, *see* Part II, *infra,* but it also conflicts with our constitutional structure of government.

*1.* As this Court recently recognized, "[s]tate courts are not free to ignore the Congressional decision whether to couple a substantive federal requirement with a private right of enforcement; the Supremacy Clause binds state courts to follow Congressional directives embodied in federal

statutes." *Bauer v. Elrich*, 8 F.4th 291, 299 (4th Cir. 2021) (citing U.S. CONST. art. VI, cl. 2).  Allowing a state-law claim "based solely on an alleged violation of" a federal statute with no private cause of action "would thwart the carefully-crafted remedies provided by Congress in enacting th[e] legislation and contravene Congress' decision not to create a private right of action for a violation of the statute." *Reliable Ambulance Serv., Inc. v. Mercy Hosp. of Laredo*, No. 04-02-00188, 2003 WL 21972724, at *6 (Tex. Ct. App. Aug. 20, 2003) (alterations omitted).

That is why, in *Bauer*, this Court said that a plaintiff could not "use the procedural mechanism of Maryland taxpayer standing to bring a claim that is 'one and the same' as a purported enforcement action brought directly under [8 U.S.C. § 1621]," which "does not authorize private enforcement."  8 F.4th at 300.  Otherwise, "state common law would govern whether and how a federal statute may be enforced, irrespective of Congressional intent.  Such a rule not only would run afoul of common sense, but also would violate basic [Supremacy Clause] principles."  *Id.* at 299; *see also id.* at 305-308 (Quattlebaum, J., dissenting) (agreeing that preemption could bar a state from creating a state-law claim premised on a federal statute with no cause of action).

Similarly, the Supreme Court in *Buckman Co. v. Plaintiffs' Legal Committee*, held that a state-law claim for fraud against the Food and Drug Administration ("FDA") premised entirely on Food, Drug, and Cosmetic Act requirements was impliedly preempted because the "federal statutory scheme amply empowers the FDA to punish and deter fraud against [it]"; there is no private right of action. 531 U.S. 341, 348 (2001). Moreover, the "balance of statutory objectives *** sought by the [FDA]," the Supreme Court explained, "can be skewed by allowing fraud-on-the-FDA claims under state tort law." *Id.* Indeed, "complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants—burdens not contemplated by Congress[.]" *Id.* at 350. Those burdens, in turn, could be counterproductive to the FDA's goals, such as by "deter[ring] off-label use" or "imped[ing] competition." *Id.* at 351.

To be sure, the Supreme Court in *Buckman* stressed that a claim of fraud on a federal agency "is inherently federal in character," meaning there was "no presumption against pre-emption." 531 U.S. at 347-348. But courts across the country have applied *Buckman*'s logic to more run-of-the-mill state-law claims, such as fraud-by-omission claims, *Perez v.*

*Nidek Co.*, 711 F.3d 1109 (9th Cir. 2013), mislabeling claims, *DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35 (1st Cir. 2023), *cert. denied*, 144 S. Ct. 1382 (2024), and product-liability claims, *Raab v. Smith & Nephew, Inc.*, 150 F. Supp. 3d 671 (S.D.W. Va. 2015).

The crux of *Buckman*, those courts have reasoned, was that the particular species of state-law claim "exist[ed] solely by virtue of" a federal statute for which Congress provided no private right of action. *Perez*, 711 F.3d at 1119 (quoting *Buckman*, 531 U.S. at 352-353 (distinguishing *Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996), where the claims "arose from the manufacturer's alleged failure to use reasonable care in the production of the product, not solely from the violation of [statutory] requirements")); *cf. College Loan Corp. v. SLM Corp.*, 396 F.3d 588, 598 (4th Cir. 2005) (finding no obstruction of federal scheme where state-law claims relied only "in part" on violations of federal law). Such a claim "serves plainly as a means of enforcing" federal law in a way Congress chose not to allow. *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 287 (1986). And that sort of "[c]onflict in [enforcement] technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Arizona v. United States*,

567 U.S. 387, 406 (2012) (quoting *Motor Coach Emps. v. Lockridge*, 403 U.S. 274, 287 (1971)).

*2.*  Here, the district court's approach "would conflict with the careful framework Congress adopted" in the Cures Act. *Arizona*, 567 U.S. at 402.  As in *Bauer*, allowing common law claims based solely on an alleged Cures Act violation "would allow third parties to circumvent Congress's decision not to permit private enforcement of the statute." *Bauer*, 8 F.4th at 300 (quoting *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 119 n.4 (2011)); *see also Astra USA*, 563 U.S. at 118 ("The absence of a private right to enforce the statutory ceiling-price obligations would be rendered meaningless if [drug purchasers] could overcome that obstacle by suing to enforce [those same] obligations *** [through state contract law] instead.").

What's more, allowing such claims would frustrate the federal enforcement scheme Congress *did* provide.  As explained above, the Cures Act outlines a "comprehensive scheme" with HHS at the enforcement helm.  *Arizona*, 567 U.S. at 402; *see also Guthrie v. PHH Mortg. Corp.*, 79 F.4th 328, 339 (4th Cir. 2023) (stressing that "comprehensive federal statutory or regulatory schemes may signal a

15

balance of interests that preempts state law claims providing additional relief").  HHS is supposed to decide what practices should be excluded from the definition of information blocking, review reports of information blocking, collect data from those complaints, and ensure coordination between interested agencies.  42 U.S.C. § 300jj-52(a), (d)(3).  HHS then has the authority to investigate and penalize claims of information blocking—but also room to exercise discretion.  *See id.* § 300jj-52(b)(1) ("The inspector general of [HHS] *** *may* investigate any claim [of information blocking].") (emphasis added); *id.* § 300jj-52(b)(2) (describing what "factors" HHS must "take into account" in determining an appropriate penalty); *see also Grants, Contracts, and Other Agreements: Fraud and Abuse; Information Blocking; Office of Inspector General's Civil Money Penalty Rules*, 88 Fed. Reg. 42,820, 42,821 (July 3, 2023) (describing "expected enforcement priorities").

This federal-focused scheme fosters uniform and consistent enforcement of the information blocking ban nationwide.  That is critical because health IT is a heavily regulated space, and an information blocking violation has downstream implications for healthcare providers, health IT developers, and patients.  *Cf. College Loan Corp.*, 396 F.3d at

16

597 (no preemption where court was "unable to confirm that the creation of 'uniformity' *** was actually an important goal" of the federal statute at issue). Specifically, in prohibiting providers and developers of certified health IT from engaging in information blocking, the Cures Act builds on the voluntary certification program established fifteen years ago in the 2009 Health Information Technology for Economic and Clinical Health ("HITECH") Act, Pub. L. No. 111-5. This framework involves a delicate interplay between HHS's National Coordinator, who promulgates standards developers must satisfy for their health IT to be certified, *see* 45 C.F.R. Part 170, and HHS's Center for Medicare and Medicaid Services ("CMS"), which facilitates Medicare and Medicaid incentive programs for providers tied to the "meaningful use" of certified health IT, *see* 42 C.F.R. §§ 414.1375(b), 495.40.

To continue to participate in these important programs, which have led to billions of dollars in incentive payments to providers since their inception,[2] both developers of certified health IT (like EHR Association

---

[2] *See, e.g.*, CMS, *Merit-Based Incentive Payment System (MIPS) Eligible Clinicians, and Eligible Hospitals and Critical Access Hospitals in the Medicare Promoting Interoperability Program*, 89 Fed. Reg. 8,758, 8,792 (Feb. 8, 2024) ("For providers, as of October 2018, eligible professionals and hospitals collectively received over $38 billion in

members) and providers who report on their use of certified health IT as participants in the incentive programs (including AHA members) must make attestations semi-annually that they have not engaged in information blocking. *See* 45 C.F.R. § 170.406(a)(1); 42 C.F.R. §§ 414.1375(b)(3)(iii), 495.40. Developers also must avoid information blocking to maintain their HHS certification, which many customers (even providers who do not participate in the incentive programs) require. *See* 45 C.F.R. §§ 170.401, 170.402(a)(1). Having a standardized and common understanding of what conduct constitutes information blocking gives much needed certainty to all actors in this highly regulated area.

The federal scheme also ensures that the information blocking ban is enforced consistently with federal policy objectives. Congress could have chosen to create a private right of action, but Congress knew that various interests needed to be "carefully balanced" when regulating information blocking, and that such balancing would require technical

---

incentives to adopt, implement, upgrade (AIU), and demonstrate meaningful use of certified EHR technology (CEHRT) through the Medicare and Medicaid Promoting Interoperability Programs (formerly the Medicare and Medicaid EHR Incentive Programs)." (footnotes omitted)).

expertise.  As HHS's National Coordinator explained to Congress shortly before the Cures Act's enactment:

> Many actions that prevent information from being exchanged may be inadvertent, resulting primarily from economic, technological, and practical challenges that have long prevented widespread and effective information sharing. Further, even conscious decisions that prevent information exchange may be motivated by and advance important interests, such as protecting patient safety, that further the potential to improve health and health care.  These interests must be carefully balanced with the potential benefits from sharing of electronic health information.   Finally, it is important to acknowledge that certain constraints on the exchange of electronic health information are appropriate and necessary to comply with state and federal privacy laws; this is not considered information blocking.

ONC, *Report on Health Information Blocking* 7 (Apr. 2015).[3]   By channeling all information blocking claims through HHS, Congress gave the agency the responsibility to engage in a nuanced evaluation of whether competing interests were being balanced properly throughout the country, and to pursue enforcement efforts accordingly.  *Cf. Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("The Supreme Court's preemption case law indicates that regulatory situations in which an

---

[3]  *Available at* https://www.healthit.gov/sites/default/files/reports/info_blocking_040915.pdf.

agency is required to strike a balance between competing statutory objectives lend themselves to a finding of conflict preemption.").

Private state-law suits would upend this carefully crafted design. "As compared to a more centralized, unified, and integrated administrative scheme, orchestrated by an administrator at the top of a hierarchical agency with powers of national scope, when a large role is given to private litigation in implementation, resulting policy will tend to be confused, inconsistent, and even straightforwardly contradictory." Stephen B. Burbank et al., *Private Enforcement of Statutory and Administrative Law in the United States (and Other Common Law Countries)* 42 (All Faculty Scholarship, Paper No. 357, 2014).[4]  Indeed, presented with different issues and different arguments, courts will undoubtedly issue decisions that are "massively inconsistent." *Id.*  This will "undermine [HHS's] efforts to administer [the Cures Act information blocking ban] harmoniously and on a uniform, nationwide basis," *Astra USA*, 563 U.S. at 120—particularly given that HHS itself is still in the process of finalizing the Act's implementing regulations.  It will also

---

[4] *Available at* https://scholarship.law.upenn.edu/cgi/viewcontent.cgi?article=1346&context=faculty_scholarship.

create uncertainty for providers and developers, leaving them unsure what is expected of them and where their IT certifications stand. Put simply, a patchwork approach in which every state and federal trial court could weigh in on what facts amount to information blocking—with zero HHS involvement—would pose a significant compliance challenge for the regulated industry, all while frustrating HHS's own enforcement.

Private parties would also pursue their own interests. Those "interests, and the associated policy positions being advocated, inevitably will be divergent across private plaintiffs and private attorneys, and they may not correspond with, and in fact may be in competition with, the public interest." Burbank et al., *Private Enforcement* at 42. In other words, private parties could sue over information blocking even where HHS determines that such an action "would frustrate federal policies." *Arizona*, 567 U.S. at 402. There could even be a scenario in which a private party files a report for information blocking, HHS declines to pursue that claim, and the party turns around and files a common law action anyway—a true affront to federal prerogatives (and indeed, one that raises constitutional concerns). *Cf. Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 758 (5th Cir. 2001) (en banc) (Smith, J., dissenting)

21

(describing constitutional concerns with "[a]llowing relators to pursue False Claims Act *** *qui tam* actions in which the government has declined to intervene").

In fact, if private parties could seek damages through common law claims for information blocking, it would be pointless—or at a minimum, much less lucrative—for them to file information blocking reports with HHS. That would, in turn, prevent the agency from gathering the information Congress requires, 42 U.S.C. § 300jj-52(d)(3), and thus limit HHS's ability to administer (and update) its own regulations appropriately. Fewer reports would also mean fewer enforcement actions, and thus fewer civil monetary penalties or settlements to Treasury for HHS to use to cover operating expenses. *See id.* § 300jj-52(b)(2)(D).

"[I]ntrusion upon the federal scheme" does not end there. *Arizona*, 567 U.S. at 402. The Cures Act provides for specific penalties that undoubtedly conflict with the determination of damages under state law. The Cures Act allows HHS to impose "disincentives" for providers and monetary penalties up to $1 million for developers. *See* 42 U.S.C. § 300jj-52(b)(2)(A)-(B). Such penalties, while onerous, are limited by a provision

requiring the Secretary to avoid duplicate penalties where possible. *Id.* § 300jj-52(d)(4). State common law claims would blow those limits to the wayside, practically guarantee duplicate penalties in many circumstances, and likely create a new cottage industry of private litigation that could dramatically raise the cost of providing compliant electronic health record services. *See Gould*, 475 U.S. at 286 ("conflict is imminent whenever two separate remedies are brought to bear on the same activity") (internal quotation marks omitted).

In short, if Maryland common law permits a claim premised on an information blocking violation, that "is an obstacle to the regulatory system Congress chose." *Arizona*, 567 U.S. at 406. To the extent that this Court has any doubts about that fact, it should invite the United States to address the issue. *See, e.g.*, *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 478 n.12 (4th Cir. 2018) (panel "invited the Government to provide a brief setting forth its views on two questions").

## II.  A CURES ACT "INFORMATION BLOCKING" VIOLATION, STANDING ALONE, CANNOT SUFFICE TO STATE A CLAIM UNDER MARYLAND COMMON LAW.

Importantly, there is a straightforward way to avoid the above Supremacy Clause concerns: by rejecting the district court's interpretation of Mayland law that made an alleged information blocking violation actionable.  Maryland courts have never found such a claim. And given the above, there is significant reason to doubt that they would. *See National Found. for Cancer Rsch., Inc. v. Council of Better Bus. Bureaus, Inc.*, 705 F.2d 98, 99-100 (4th Cir. 1983) ("[A] federal court must 'determine the rule that the state Supreme Court would probably follow, not fashion a rule which we, as an independent federal court, might consider best.'") (citation and alteration omitted).  The Court should thus construe Maryland law to avoid unnecessarily raising constitutional concerns.  *See Stenberg v. Carhart*, 530 U.S. 914, 944 (2000) (federal courts may adopt "reasonable and readily apparent" constructions of state laws to save their constitutionality).

In general, state courts across the country refuse to find viable a common law cause of action based on a violation of a statute that has no private right of action.  *See, e.g.*, *Reliable Ambulance Serv.,* 2003 WL

21972724, at *6; *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 27 (Iowa 2012) (declining to "authorize a negligence action based upon a duty that exists only because of" a federal statute that "lack[s] a private right of action"); *Highmark Fed. Credit Union v. Hunter*, 814 N.W.2d 413, 418 (S.D. 2012) ("If [a federal statute] does not create a private right of action, then it follows that an individual cannot use the [statute] to establish a duty in an individual civil claim."); *Patel v. Catamaran Health Sols., LLC*, No. 15-CV-61891, 2016 WL 5942475, at *8 (S.D. Fla. Jan. 14, 2016) ("Florida law is clear that no private right of action exists for alleged statutory violations, even on common law theories, unless the text or legislative history of the statute at issue confirms that the Legislature intended to confer such a right."); *Springer v. Egli*, 44 N.E.3d 690, 693 (Ind. Ct. App. 2015) ("When a civil tort action is premised upon violation of a duty imposed by statute, the initial question is whether the statute confers a private right of action."); *Merrick Bank Corp. v. Valley Nat'l Bank*, No. CV 13-7756, 2017 WL 5951583, at *4 (D.N.J. Nov. 30, 2017) ("[A] plaintiff cannot assert a common law claim by simply stating that a defendant has violated a statute that does not in itself afford a private right of action.").

The district court offered no persuasive reason to think Maryland would be different. The court held that Real Time was likely to succeed on its unfair competition claim based entirely on an information blocking violation. *See* JA1007 (finding Real Time "likely to succeed" on claim that PointClickCare's "conduct amounts to 'information blocking'"). But *amici*, like a different federal court interpreting Maryland law, are "unaware of any case law that suggests that [a plaintiff] may predicate a [Maryland] claim for unfair competition on a purported violation of [federal law]." *Waypoint Mgmt. Consulting, LLC v. Krone*, No. CV ELH-19-2988, 2022 WL 2528465, at *61 (D. Md. July 6, 2022). To the contrary, in Maryland, that tort is "based on the principle of common business integrity," *Baltimore Bedding Corp. v. Moses*, 34 A.2d 338, 343 (Md. Ct. App. 1943), and "old-fashioned honesty," *GAI Audio of New York, Inc. v. Columbia Broadcasting Sys. Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975) (internal quotation marks omitted). Thus, a plaintiff should base the claim on "fraud, deceit, trickery or unfair methods[.]" *Electronics Store, Inc. v. Cellco P'ship*, 732 A.2d 980, 991 (Md. Ct. Spec. App. 1999) (quoting *Baltimore Bedding*, 34 A.2d at 338). Allegedly violating a

federal statute—particularly one that imposes technical obligations like the Cures Act—does not necessarily or automatically qualify.

The district court cited the Restatement for the proposition that "a violation of a statute may constitute unfair competition even if the statute does not afford the plaintiff a private cause of action." JA1006-1007 (citing Restatement of Law (Third) of Unfair Competition, § 1, cmt. (g) (1995)). In fact, the Restatement supports the opposite rule, by requiring that a statute underlying an unfair competition claim be "*actionable* by the other" party. Restatement § 1(b) (emphasis added); *see id.* § 1, cmt. a (instructing courts to ensure "a private right of action is not inconsistent with the legislative intent"); *see also Thermal Design, Inc. v. Am. Soc'y of Heating, Refrigerating & Air-Conditioning Eng'rs, Inc.*, No. 7-C-765, 2008 WL 1902010, at *8 (E.D. Wisc. Apr. 25, 2008) ("A claim arises under [section 1(b) of the Restatement] when the acts or practices are otherwise actionable under another statute or the common law."). That explains why many courts in other jurisdictions have in fact refused to recognize an unfair competition claim based solely on a statute or regulation providing no private cause of action. *See, e.g., Conboy v.*

*AT&T Corp.*, 241 F.3d 242, 257-258 (2d Cir. 2001); *Malden Transp., Inc. v. Uber Techs., Inc.*, 386 F. Supp. 3d 96, 101 (D. Mass. 2019).

The district court also cited two cases in support of its holding, but neither moves the needle. *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 624 (D. Md. 2001), acknowledges that a violation of a statute may support a claim for unfair competition. But unlike here, the unfair competition claim in *Berlyn* was predicated upon violations of a statute that *did* provide a private right of action—namely, federal antitrust law. *See id.*; *see also* 15 U.S.C. § 26. Meanwhile, *Intus Care, Inc. v. RTZ Assoc., Inc.*, No. 24-CV-1132, 2024 WL 2868519, at *2-3 (N.D. Cal. June 5, 2024), heavily relied on California case law inapplicable here.

Finally, the district court concluded that Real Time was likely to succeed on its claim of tortious interference with contractual relations. But under Maryland law, a such a claim requires:

> (1) The existence of a contract or a legally protected interest between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract; (4) without justification on the part of the defendant; (5) the subsequent breach by the third party; and (6) damages to the plaintiff resulting therefrom.

*Brass Metal Prod., Inc. v. E-J Enterprises, Inc.*, 984 A.2d 361, 383 (Md. Ct. Spec. App. 2009) (citations omitted). Allegedly violating an inactionable statute is not enough to satisfy these elements. Indeed, several courts have held that "the violation *** of a statute that creates *no* private cause of action is not actionable through tortious interference." *Vilcek v. Uber USA, LLC*, 902 F.3d 815, 821 (8th Cir. 2018); *see also, e.g.*, *DP-Tek, Inc. v. AT & T Glob. Info. Sols. Co.*, 100 F.3d 828, 834 (10th Cir. 1996) ("[Kansas] law suggests independently actionable conduct is required" for a tortious interference claim.).[5]

None of this is to deny that the *conduct underlying* an information blocking violation can be used to prove the elements of a Maryland common law claim, including an unfair competition or tortious interference claim, in an appropriate circumstance. But the point is that allowing a Maryland common law claim based *solely* on the existence of an information blocking violation—such that the statutory violation is a

---

[5] Given the district court's focus on the alleged information blocking violation when considering Real Time's unfair competition claim, it is not clear whether the court relied exclusively on that alleged violation when considering Real Time's tortious interference claim. This Court should therefore clarify that such a violation, standing alone, cannot satisfy a Maryland tortious interference claim, and remand for the district court to apply that clarified standard.

*per se* violation of Maryland common law—"would permit the commandeering of state law to create a right of action where none existed." *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 520 (11th Cir. 2015). That is, at minimum, an "extraordinary legal theor[y]," *id.* at 533, and one this Court should not be the first to bless, *see, e.g.*, *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 771 (4th Cir. 1995) ("[I]t is not our place to suggest expansions of state law."). Thus, although there is no reason to believe that Maryland would recognize such a claim, if this Court is unsure, it should certify that question to the Supreme Court of Maryland. *See* Md. Code Ann., Cts. & Jud. Proc. § 12-603; Md. Rule 8-305.

## CONCLUSION

The Court should reverse—or, at a minimum, narrow—the district court's holding that private parties may commandeer state common law to effectively enforce the Cures Act's information blocking prohibition. Holding otherwise would conflict with both congressional intent and Maryland law, and permit private actors to disrupt the Act's enforcement by the only entity Congress selected to carry out that task—HHS.

Dated:  September 23, 2024          Respectfully submitted,

*/s/ James E. Tysse*
James E. Tysse
Kelly M. Cleary
Margaret O. Rusconi
Emily I. Gerry
Stephanie Ondroff
AKIN GUMP STRAUSS
   HAUER & FELD LLP
2001 K Street N.W.
Washington, D.C. 20006
202-887-4000
jtysse@akingump.com

*Counsel for* Amici Curiae

31

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of <u>Federal Rules of Appellate Procedure 29(a)(5)</u> because it contains 5,904 words, excluding the parts of the brief exempted by <u>Federal Rule of Appellate Procedure 32(f)</u>.

This brief complies with the typeface requirements of <u>Federal Rule of Appellate Procedure 32(a)(5)</u> and the type style requirements of <u>Federal Rule of Appellate Procedure 32(a)(6)</u> because it was prepared in a proportionally spaced typeface using Microsoft 365, 14-point Century Schoolbook font.


*/s/ James E. Tysse*
James E. Tysse

September 23, 2024