**24-1773**

# United States Court of Appeals
## for the
# Fourth Circuit

REAL TIME MEDICAL SYSTEMS, INC.,

*Plaintiff/Appellee,*

— v. —

POINTCLICKCARE TECHNOLOGIES, INC., d/b/a PointClickCare,

*Defendant/Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT

# BRIEF OF APPELLEE

M. Celeste Bruce
Michael T. Marr
Madelaine Kramer Katz
RIFKIN WEINER LIVINGSTON, LLC
7700 Wisconsin Avenue, Suite 320
Bethesda, Maryland 20814
(301) 951-0150

*Counsel for Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 130509)

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1773__    Caption: __PointClickCare Technologies, Inc. v. Real Time Medical Systems, Inc.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Real Time Medical Systems, Inc.
(name of party/amicus)

who is _____ appellee _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: s/ M. Celeste Bruce          Date:    08/26/2024

Counsel for: Real Time Medical Systems, Inc.

Print to PDF for Filing     Reset Form

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................. iii

JURISDICTIONAL STATEMENT ...................................................... 1

INTRODUCTION ........................................................................ 1

STATEMENT OF THE ISSUES......................................................... 5

STATEMENT OF THE CASE............................................................ 5

SUMMARY OF THE ARGUMENT ..................................................... 12

STANDARD OF REVIEW .............................................................. 14

ARGUMENT ............................................................................. 17

    A.    The District Court Crafted a Narrowly Tailored Injunction
        to Return the Parties to the Last Uncontested Status ........................... 17

    B.    RTMS Is Likely to Succeed on Its State Tort Law Claims
        for Unfair Competition..................................................................... 19

        1.    Unfair Competition and Restraints of Trade Have
            Deep Roots in Maryland Common Law .................................... 19

        2.    Under the Maryland Common Law Tort of Unfair
            Competition, No One Is Justified in Damaging
            Another's Business Through Unfair Methods ........................... 21

        3.    The District Court Did Not Abuse Its Discretion or
            Commit Clear Error When It Found Facts That
            Exposed PCC's Unfair Competition with RTMS..................... 22

            a.    Security Exception............................................................ 23

            b.    Health IT Performance Exception .................................. 24

        4.    The District Court Did Not Misapprehend the Law of
            Unfair Competition When It Found RTMS Likely to
            Succeed on the Merits of that Claim........................................ 25

    C.    The Proposition Underlying PCC's Veiled Preemption
        Argument Is an Incorrect Statement of Law ....................................... 30

D.    RTMS Is Likely to Succeed on Its State Tort Law Claim for Tortious Interference with Contractual Relations ...............................38

E.    Neither the Security Nor the Feasibility Exception Excuse PCC's Information Blocking .................................................................41

F.    PCC's Constitutional Arguments Are Equally Unavailing ...............47

G.    The District Court Did Not Abuse Its Discretion in Finding That the Equities Tip Sharply in RTMS's Favor ................................49

    1.    RTMS Would Be Irreparably Harmed Absent Relief .............49

    2.    The Balance of Hardships Favors RTMS ................................51

    3.    The Public Interest Weighs in Favor of an Injunction.............51

CONCLUSION ........................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbot v. American Cyanamid Co.,*
  844 F.2d 1108 (4th Cir. 1988) ......................................................... 31-32

*Allum v. Valley Bank*,
  970 P.2d 1062 (Nev. 1998) ...............................................................34

*Anderson v. Bessemer City*,
  470 U.S. 564 (1985) ..........................................................................16

*Arundel Corp. v. Marie*,
  383 Md. 489 (2004) ...........................................................................20

*Assanah-Carroll v. Law Offices of Edward J. Maher, P.C.*,
  480 Md. 394 (2022) ...........................................................................19

*Baltimore Bedding Corp. v. Moses*,
  182 Md. 229 (1943) ...................................................................... 20, 21

*Barela v. C.R. England & Sons, Inc.*,
  197 F.3d 1313 (10th Cir. 1999) .........................................................33

*Bland v. Educ. Credit Mgmt. Corp.,*
  ELH-11-02812, 2012 U.S. Dist. Ct. 23006 (D.Md. 2012) ..................32

*Boyle v. Vista Eyewear, Inc.*,
  700 S.W.2d 859 (Mo. Ct. App. 1985) ........................................... 33-34

*Brightview Grp. v. Teeters*,
  441 F. Supp. 3d 115 (D. Md. 2020) ...................................................19

*Clearone Advantage, LLC v. Kersen*,
  No. JKB-23-03446, 2024 U.S. Dist. LEXIS 114508 (D. Md. 2024) ...................16

*College Loan Corp. v. SLM Corp.*,
  396 F.3d 588 (E.D.Va. 2004) ...................................................... 31, 32

*Coman v. Thomas Mfg. Co.*,
  381 S.E.2d 445 (N.C. 1989) ..............................................................34

*DiBiase v. SPX Corp.*,
  872 F.3d 224 (4th Cir. 2017)..................................................................14

*DSI Corp. v. United States*,
  655 F. 2D 1072 (1981)...........................................................................48

*Farm Fresh Direct By a Cut Above, LLC v. Downey*,
  Civil Action, No. ELH-17-1760, 2017 U.S. Dist. LEXIS 178190
  (D. Md. Oct. 26, 2017) .........................................................................37

*Fowler v. Printers II, Inc.*,
  89 Md. App. 448 (1991) .......................................................................38

*G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*,
  344 F.R.D. 446 (D. Md. 2023)..............................................................21

*Goldman v. Building Ass'n*,
  150 Md. 677 (1926) ..............................................................................19

*Grempler v. Multiple Listing Bureau*,
  258 Md. 419 (1970) ................................................................. 19, 20, 29

*HCI Techs., Inc. v. Avaya, Inc.*,
  241 Fed. Appx. 115 (4th Cir. 2007) ............................................. 45, 46

*Hope v. Warden York Cty. Prison*,
  972 F.3d 310 (3rd Cir. 2020) ...............................................................46

*Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp.*,
  17 F. 3d 691 (4th Cir. 1994)..................................................................49

*Human Touch DC, Inc. v. Merriweather*,
  2015 U.S. Dist. LEXIS 186805 (D. Md. May 26, 2015) ............................. 51, 52

*Intus Care, Inc. v. RTZ Assoc., Inc.*,
  2024 U.S. Dist. LEXIS 100190 (N.D. Cal. 2024)..................................32

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
  456 U.S. 844 (1982) ..............................................................................36

*Kanagy v. Fiesta Salons*,
  208 W. Va. 526 (2000) ..........................................................................33

*Kramer v. Mayor & City Council of Baltimore*,
  124 Md. App. 616 (1999) ......................................................................33

*Lake Shore Invs. v. Rite Aid Corp.*,
  67 Md. App. 743 (1986) ................................................................. 38, 39

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
  2 F.4th 330 (4th Cir. 2021) ...................................................... 14, 15, 16

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014)................................................................15

*Macklin v. Robert Logan Assocs.*,
  334 Md. 287 (1994) ...........................................................................38

*Madsen v. Women's Health Ctr, Inc.*,
  512 U.S. 753 (1994) ..................................................................... 17-18

*Magee v. Dansources Tech. Servs.*,
  137 Md. App. 527 (2001) ............................................................. 34, 35

*Makovi v. Sherwin-Williams*,
  316 Md. 603 (1989) ...........................................................................34

*Mascaro v. Snelling & Snelling of Balt., Inc.*,
  250 Md. 215 (1968) ...........................................................................21

*Meury v. Connie Kalitta Servs./Am. Int'l Airways*,
  181 F.3d 102 (6th Cir. 1999)..............................................................33

*Mike's Train House, Inc. v. Broadway Ltd. Imps., LLC*,
  708 F. Supp. 2d 527 (D. Md. 2010)............................................... 15-16

*Molloy v. Metro. Transp. Auth.*,
  94 F.3d 808 (2d Cir. 1996)..................................................................42

*Morrison v. Garraghty*,
  239 F.3d 648 (4th Cir. 2001)..............................................................18

*Mt. Valley Pipeline, LLC v. 6.56 Acres*,
  915 F.3d 197 (4th Cir. 2019)..............................................................15

*Noya v. Frontier Adjusters, Inc.*,
  2013 U.S. Dist. LEXIS 80672 (D. Md. June 7, 2013) ................................ 49, 50

*Original Dells, Inc. v. Soul 1 Ent. Grp.*,
  2024 U.S. Dist. LEXIS 159356 (D. Md. Sep. 5, 2024)........................................37

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC,*
   905 F. Supp. 2d 675 (D. Md. 2012) .............................................................. *passim*

*Pacesetter Homes, Inc. v. GBL Custom Home Design, Inc.*,
   2021 U.S. Dist. LEXIS 154843 (D. Md. Aug. 17, 2021) .....................................36

*Pashby v. Delia,*
   709 F.3d 307 (4th Cir. 2013) ............................................................... 14, 16

*Penn Central Transportation Co. v. New York City,*
   438 U.S. 104, 98 St. Ct. 2646 (1978) .....................................................48

*Pierce v. N.C. State Bd. of Elections*,
   97 F.4th 194 (4th Cir. 2024) .............................................................16

*Putt-Putt, LLC v. 416 Constant Friendship, LLC,*
   936 F. Supp. 2d 648 (D. Md. 2013) ...................................................... 36, 37

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
   872 F.2d 75 (4th Cir. 1989) ............................................................... 14, 15

*Roe v. United States DOD,*
   947 F.3d 207 (4th Cir. 2020) .............................................................17

*Rosciszewski v. Arete Assocs., Inc.*,
   1 F.3d 225 (4th Cir. 1993) ............................................................... 36, 38

*SAS Inst., Inc. v. World Programming Ltd.,*
   874 F.3d 370 (4th Cir. 2017) .............................................................50

*Scotch Whisky Ass'n v. Majestic Drilling Co.*,
   958 F.2d 594 (4th Cir. 1992) .............................................................37

*Silkwood v. Kerr-McGee Corp.*,
   464 U.S. 238 (1984) .......................................................................32

*Smith v. United States*,
   568 U.S. 106, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013) ....................................40

*Steves & Sons, Inc. v. Jeld-Wen, Inc.*,
   988 F.3d 690 (4th Cir. 2021) ........................................................... 40, 49

*Teleguz v. Zook,*
   806 F.3d 803 (4th Cir. 2015) .............................................................16

*Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*,
705 F. Supp. 3d 510 (D. Md. 2023) ....................................................38

*Trandes Corp. v. Guy F. Atkinson Co.*,
996 F.2d 655 (4th Cir. 1993) ....................................................... 36, 37

*Traveler's Indemn. Co. v. Merling*,
326 Md. at 329 (1992) .......................................................................39

*Trimed, Inc. v. Sherwood Med. Co.*,
722 F.Supp 879 (D.Md. 1991) ...........................................................20

*Trimed, Inc. v. Sherwood Med. Co.*,
977 F.2d 885 (4th Cir. 1992) .............................................................21

*Trump v. Int'l Refugee Assistance Project*,
582 U.S. 571 (2017) ..........................................................................17

*United States v. Charleston Cty.*,
365 F.3d 341 (4th Cir. 2004) .............................................................16

*United States v. Mason*,
52 F.3d 1286 (4th Cir. 1995) .............................................................15

*Variable Annuity Life Ins. Co. v. Coreth*,
535 F. Supp 3d 488 (E.D. Va. 2021) .................................................17

*Watson v. Peoples Sec. Life Ins. Co.*,
322 Md. 467 (1991) ...........................................................................35

*Waypoint Mgmt. Consulting, LLC v. Krone*,
2022 U.S. Dist. LEXIS 119764 (D. Md. July 6, 2022) ......................33

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ............................................................... 14, 50, 53

*XL Specialty Ins. Co. v. Truland*,
2014 U.S. Dist. LEXIS 119096 (E.D. VA. Aug. 21, 2014) .................17

## Statutes and Other Authorities:

15 U.S.C. § 1125(a) ...........................................................................36

17 U.S.C. § 504(c)(1) .........................................................................37

28 U.S.C. § 1292 ................................................................................1

28 U.S.C. § 1332 ................................................................................1

43 U.S.C. § 300jj-53 .........................................................................29

45 C.F.R. § 170-71 ...........................................................................29

45 C.F.R. § 171.203 ..........................................................................22

45 C.F.R. § 171.205 ..................................................................... 22, 48

45 C.F.R. § 170.301 ..........................................................................44

45 C.F.R. § 171.301 ..........................................................................44

45 C.F.R. § 7424-01 ..........................................................................29

21st Century Cures Act: Interoperability, Information Blocking, and the
    ONC Health IT Certification Program, 85 Fed. Reg. 25642 ...............29

*Restatement (2d) Torts,* § 766 ............................................................39

*Restatement (3d) Unfair Competition* § 1 (1995) ................................22

Prosser and W. Keeton, *The Law of Torts,* § 129 (5th ed. 1984) ............39

## JURISDICTIONAL STATEMENT

Subject matter jurisdiction was proper under 28 U.S.C. § 1332. This Court has subject-matter jurisdiction under 28 U.S.C. § 1292.

## INTRODUCTION

Real Time Medical Systems, Inc. ("RTMS")  is a healthcare data analytics company that partners with approximately 1,700 Skilled Nursing Facilities ("SNFs") to improve the quality of patient care and to reduce hospital admissions through a proprietary suite of cloud-based, Value-Based Care software. JA394-395, JA994, JA1411. RTMS's software monitors patients' electronic healthcare records ("EHRs") in real time to identify concerning patient information and data patterns that members of the healthcare team may otherwise overlook. JA393-394, JA1412. Once identified, RTMS sends interventional alerts to the healthcare team before patients become sicker, require hospitalization, or die. JA393-394, JA1412. These real time data analytics have demonstrably improved patients' outcomes and decreased hospital admissions as much as 50%. JA1412, JA1456.

RTMS connects disparate, individually-innocuous symptoms that viewed together, foretell an impending medical issue that can be addressed before becoming life-threatening. JA183, JA1409. To provide these interventional alerts, RTMS collects and analyzes data in patients' EHRs, and as relevant here, for more than 1,000 SNFs contracted with RTMS whose records are hosted on

PointClickCare, Inc.'s ("PCC") records storage platform. JA1456. For more than a decade, PCC has known that RTMS has accessed PCC's system with automated users to extract patients' data that is analyzed by RTMS to provide life-saving alerts. JA395-396, JA404. During this time, RTMS retrieved patients' EHRs in consistent volumes and frequencies from PCC's system, and, at times, implementing changes to address demands by PCC regarding timing and frequency of RTMS's data extraction. JA128, JA130.

In the spring of 2023, PCC entered into merger/acquisition discussions with RTMS, under terms of a Mutual Non-Disclosure Agreement. JA407, JA997, JA1431. During the merger discussions, RTMS provided substantial details of its proprietary technology, solutions and intellectual property, as well as information and documents identifying RTMS's customers and contracts, among other confidential and technical information. JA583-586, JA997, JA1014, JA1061-1064, JA1433-1435, JA1526. In late 2023, PCC abruptly ended discussions, informed RTMS that PCC was going to be the only data analytics/value-based care technology provider in the long-term care space, and instituted indecipherable CAPTCHAs to block RTMS's access to patients' EHRs. JA419, JA466-467, JA555, JA594-595. As PCC became more aggressive in its efforts to block RTMS's access to patients' EHRs, RTMS attempted to reach a solution with PCC, but each resolution was rejected by PCC. JA466, JA1420-1422, JA1430-1431.

After the preliminary injunction hearing, the District Court found that:

PCC's actions violated state law; RTMS would suffer irreparable harm without

preliminary relief; and the balance of equities and the public interest strongly

favored relief. The District Court enjoined PCC from blocking RTMS's access to

patients' EHRs through the use of indecipherable CAPTCHAs. JA993-1019.

This Court should affirm.

PCC does not and cannot offer any serious challenge to the District Court's

findings on the equitable factors because they weigh heavily in RTMS's favor, and

RTMS has demonstrated a likelihood of success on the merits. JA1006-1016. The

District Court found that PCC's actions were likely motivated by a desire to

destroy a competitor and not by a legitimate concern about security or feasibility—

and therefore RTMS was likely to succeed on the merits of both its unfair

competition and tortious interference with contractual relations claims. JA1013-

1016.

PCC does not own the patient information it seeks to block RTMS from

accessing. JA1229, JA1417. During the more than a decade of RTMS's

unencumbered access, PCC did not raise an issue that RTMS's automated data

collection process posed security concerns—nor did PCC raise this as an issue

during merger/acquisition talks or subsequent discussions. JA465-466, JA588-589.

Further, PCC never raised the infeasibility of exporting patients' EHRs during

discussions regarding solutions to PCC's blocking through indecipherable CAPTCHAs. JA588-589.

Rather than dispute the District Court's factual findings, and to avoid the consequences of its unlawful conduct, PCC has framed RTMS as a malicious, unauthorized actor, accessing PCC's systems with automated users that pose a security risk, taking PCC's data without paying, and labeling the District Court's injunction as "dangerous" and "without precedent." *See* PCC Brief at 1-4. All of this to deflect from PCC's unlawful behavior to drive RTMS, a competitor, out of business by blocking access to patients' EHRs—information that it does not own, and to which RTMS has been given access by entities authorized to do so. JA437-438, JA1014-1015. That access is authorized by and performed in the same manner as SNFs' access. JA447-448, JA462-464. Moreover, the parameters of RTMS's access are dictated by SNFs—thus, the entity with the direct authority from patients determines what access RTMS is to be afforded. JA447.

It is not within the purview of the EHR storage company to decide who is a member of the healthcare team and what information that member can access. JA994-995, JA998. Until the merits are decided based on a fully developed record, RTMS requested the District Court to enjoin the imposition of PCC's indecipherable CAPTCHAs so that RTMS can continue to provide its life-saving interventional analytics to a vulnerable population and compete fairly without

unlawful interruption and interference from PCC. JA1005. The narrowly tailored

injunction does not meaningfully burden PCC. The District Court's grant of a

preliminary injunction should be affirmed.

## STATEMENT OF THE ISSUES

Whether the District Court abused its discretion in granting a narrowly

tailored preliminary injunction enjoining PCC from using indecipherable

CAPTCHAs to block RTMS' access to patients' EHRs stored on PCC's system

based on its findings that (1) RTMS had shown a likelihood of success on the

merits of its unfair competition and tortious interference with contractual relations

claims; and (2) the irreparable harm; balance of hardships; and public interest

weighed in favor of granting the injunction?

## STATEMENT OF THE CASE

PCC has imposed unlawful and crippling business interruptions upon RTMS

to drive it out of competition and terminate RTMS's customer relationships.

JA486, JA996-997, JA999, JA1016. Fair competition connotes competing on

price, service, or product quality. Unfair competition is just the opposite. It

expresses an unwillingness to compete to improve features, services, and price in a

way that would benefit the public, and tacitly admits, whether out of cowardice or

some other bent, that the company who elects to engage in such behavior cannot

compete fairly. *See Paccar Inc. v. Elliot Wilson Capitol Trucks LLC,* 905 F. Supp.

2d 675, 692-93 (D. Md. 2012). The District Court's factual findings evidence that fair competition is not what PCC is after. JA1006-1015. Rather, PCC wants to replace RTMS in the value-based care/patient analytics market. JA419. That motivation may be found in fair competition; however, when that motivation relies on tricks, deceit, or unlawful business practices, the law of unfair competition and tortious interference steps in to block anti-competitive conduct—and if need be, granting preliminary relief to promote fair competition for the benefit of the public and here, a vulnerable patient population until the lawsuit is resolved. JA1013-1014.

PCC and RTMS are competitors in the value-based care/patient analytics market. JA60, JA419, JA997. PCC is the latecomer to this market; RTMS has been in this market for over a decade. JA19, JA396, JA398, JA997. PCC is one of the largest EHR companies in the long-term care space. JA0994. Approximately eighty percent of RTMS's SNF customers store their patients' EHRs on PCC's system. JA994, JA1017.

For more than a decade, RTMS enjoyed open access to EHRs that PCC stored for RTMS's customers to collect patient information and to provide real-time analytics for better patient care outcomes. JA19, JA103, JA396, JA398, JA448, JA948-949, JA995. RTMS extracted data from PCC's EHR platform

without interruption or complaint from PCC—employing the same automated

information gathering as it does now. JA19, JA398, JA448, JA948-949, JA995.

PCC does not own a patient's healthcare record. JA1229, JA1417.  PCC

stores the records under contracts between SNFs and PCC (JA1414), including

under a Business Associates Agreement ("BAA"), which is required under the

Health Insurance Portability and Accountability Act ("HIPAA"). JA1344. Patients'

EHRs are stored on PCC's systems in formats and locations dictated by PCC.

JA685-686, JA807-810, JA1003-1004. To access these records, SNFs create

usernames and passwords. JA995. RTMS, as a member of the patient's healthcare

team, enters into contracts with SNFs to provide for interventional and preventive

care services. JA994. RTMS also enters BAAs with its SNF customers. JA398.

SNFs provide user IDs and passwords to RTMS to access securely PCC's EHR

platform. JA10, JA447-448, JA995. It was not disputed that RTMS accesses

patients' EHRs in the same manner as authorized employees of SNFs. JA447,

JA995.

 That PCC stores EHRs under lock and key proved too powerful a

temptation PCC was not able to resist when it began competing with RTMS in the

value-based care/patient analytics market. JA656. That medical record, once hung

on a patient's bed or stored in a filing cabinet, in today's environment is stored in

the cloud or on a server off premises. JA128-129, JA417. Electronic storage does

not, however, change the ownership of healthcare records (which still belong to patients), nor should it provide an opportunity to undermine the efforts of patients' healthcare teams to provide for care and treatment, and facilitate better outcomes.

Since its entry into the value-based care/patient analytics market, PCC and RTMS competed directly to provide patient analytics for Maryland's CRISP program (which involves 150 state-funded skilled nursing facilities) (JA179); RTMS was awarded the contract. JA60, JA399-401, JA997. In March 2023, PCC acquired another RTMS competitor, Patient Pattern. JA61, JA401-402. Shortly thereafter, in May 2023, PCC expressed an interest in merging with/acquiring RTMS. JA406-08, JA585-586, JA997, JA1013, JA1445-1446, JA1454-1455, JA1526-1527. During the due diligence between June-September 2023, RTMS shared with PCC details of its proprietary technology, solutions and intellectual property, its customer lists and contracts. JA583, JA585-586, JA997, JA1014, JA1061-1064, JA1433-1435, JA1526. At no point did PCC object to RTMS's automated information gathering. JA588-589, JA997-998.

In October 2023, the acquisition discussions between RTMS and PCC abruptly and unilaterally ended by PCC going silent. JA998. PCC, without explanation or warning, implemented indecipherable CAPTCHAs on October 11, 2023 (JA130) preventing RTMS from providing patient analytics and fulfilling its customers contracts. JA130, JA449-450, JA587, JA998. This is how RTMS

became aware that PCC was no longer interested in a merger/acquisition. JA409-410, JA587, JA998. Subsequently, PCC informed RTMS:

> Well, we're not going to work with you. We're not going to give you data. We believe that the tech stack belongs to us and should belong to us, and we should have the opportunity to develop it. And therefore, we're not going to give you access to data.

JA409-410, JA588, JA594, JA618.

The purpose of CAPTCHAs is "to prove that it's a human on the other side of the screen." JA449. If a human cannot solve the CAPTCHA, the "test" is not a CAPTCHA (Completely Automated Public Turing test to tell Computers and Humans Apart). JA449. If the CAPTCHA is indecipherable, meaning it cannot be solved, the user cannot log into the system. JA449. As such, the CAPTCHA ceases to be a verification and instead becomes a barrier, blocking out the user.

In the face of the indecipherable CAPTCHAs, and to find a business solution, RTMS requested that PCC export the patient information, eliminating automated activity, or through queries. JA471-474, JA998-1000. PCC rejected both solutions. JA949. PCC presented a Marketplace Application Programming Interface agreement ("API"), which did not contain EHRs necessary for RTMS to fulfill its contractual obligations to its customers and would put RTMS out of business. JA132-133, JA471-472, JA593, JA999-1000. When RTMS suggested revisions to the API, PCC again did not respond. JA591-594.

During these discussions in October 2023, the indecipherable CAPTCHAs were turned off. JA134, JA999. When PCC and RTMS did not reach an agreement, the indecipherable CAPTCHAs were reinstituted with greater intensity. JA134-137, JA474, JA999-1000. In January 2024, when RTMS filed the lawsuit, they again stopped. JA137. Without explanation or warning in May 2024, PCC redeployed more complicated, indecipherable CAPTCHAs (JA138, JA478-479) that could not be solved by humans. JA528-532, JA549-554, JA1404-1406.

The timing of PCC's actions is unmistakably damning. JA1014. PCC began changing the locks to the patient information when it unilaterally terminated the discussions to acquire RTMS, after being provided RTMS's confidential and proprietary technology. JA625, JA1057, JA1129. PCC understood that RTMS could not exist, much less compete with PCC without access to patients' EHRs. JA55, JA414, JA1014. When PCC realized it would have to compete in the value-based care/patient analytics market on the merits of its product and service, PCC barred the door of its EHR platform knowing that RTMS was dependent on access to patients' EHRs to provide its interventional analytics. JA996-999, JA1011-1012, JA1421-1422.

PCC's wrongful conduct imposes a high burden on a vulnerable patient population. JA178, JA564. PCC, a competitor in the value-based care/patient analytics market understands the importance of the interventional alerts to

improved patient care, and the harm to patients in its absence. JA122-126, JA997, JA1007-1008, JA1014, JA1067-1071. PCC is also well aware of the patients' needs in Maryland's CRISP program having competed against RTMS for the award. JA565, JA865, JA997. PCC also understands the importance of sound medical care provided through the use of automated information gathering. Using bots, PCC administers over 1.2 million medications each day. JA124-126, JA425, JA811.

PCC, through its use of indecipherable CAPTCHAs has interfered with RTMS's provision of interventional alerts by blocking RTMS's access to patients' EHRs. Rather than compete fairly, PCC chose to put patients' health and outcomes at risk until RTMS was displaced as a competitor.

PCC's true intent is borne out by its own use of automated users. Automated users are not inherently a security risk. JA526, JA1011-1012. PCC uses bots to perform its own data analytics that compete with RTMS's service. JA811, JA1003-1004. PCC has no explanation (and offered none at the hearing) as to why its bots are okay but RTMS's authorized access is somehow a malicious security risk. JA1003-1004.

RTMS did not seek an injunction precluding PCC from employing security measures to stop malicious, unauthorized users from accessing patients EHRs— "only [to] enjoin PCC from using unsolvable CAPTCHAs" to block RTMS's

11

access, which present "a real and imminent threat to RTMS's continued ability to do business." JA1005, JA1017. Contrary to PCC's argument, RTMS's authorized automated users do not pose a threat to PCC, nor did PCC offer evidence demonstrating that RTMS was a security risk. JA1017.

Narrowly drawn, the District Court did not enter an injunction precluding PCC from enacting or employing security measures to safeguard patient health information in its EHR platform. JA1017-1018. The District Court appropriately ordered that because of PCC's unlawful, anti-competitive behavior, PCC could not employ indecipherable CAPTCHAs to block RTMS's access. Further, PCC did not explain during the evidentiary hearing, in its papers, or in its Brief what evidence it offered demonstrating that RTMS's automated access suddenly posed a security risk, nor could PCC articulate what that risk was. JA1002-1004. Instead, PCC tried to justify its behavior relying primarily on two exceptions to the Cures Act ("Act"), which the District Court found unavailing. JA884-885.

Based on the record below, the District Court did not abuse its discretion when it granted the narrowly tailored injunction to preclude PCC from barring RTMS's access and should be affirmed.

## SUMMARY OF THE ARGUMENT

1. The District Court did not abuse its discretion in granting RTMS the narrow injunction in connection with RTMS's unfair competition claim.

The District Court narrowly tailored the injunction after a two-day evidentiary hearing where both parties presented documentary and testimonial evidence and after its conclusion that PCC's evidence was not credible. The District Court properly concluded—based upon the evidence presented—that RTMS was likely to succeed on the merits of its unfair competition and the tortious interference with contractual relations claims.

2.  The District Court did not misapprehend the law of either tort claim and its recitation of the elements of each claim were factually correct and more importantly, was correct in applying its factual findings to each element of the claims.

3.  PCC ignores the District Court's factual findings regarding PCC's unlawful anti-competitive and predatory conduct intentionally directed at RTMS. PCC offered no evidence to connect RTMS to any alleged degradation of PCC's service or security risk posed by RTMS.  An academic discussion about the Act does not cure these fatal omissions.

4.  As a declaration of public policy that seeks to improve patient care and patient outcomes, the Act provides the violation of public policy to ground the unfair competition claim and the wrongful act to ground the tortious interference claim. But, as the record demonstrates, even without

the Act, PCC's behavior would still be unlawful and predatory. PCC's strong-arming included, as the District Court identified, conduct outside of the purview of the Act such that it provides no cover for PCC's anti-competitive conduct.

On all these issues, the Court should affirm.

## <u>STANDARD OF REVIEW</u>

"A preliminary injunction is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of the litigation." *Di Biase v. SPX Corp.,* 872 F.3d 224, 230 (4th Cir. 2017) (citing *Pashby v. Delia,* 709 F.3d 307, 319 (4th Cir. 2013)). To be successful, RTMS needed to establish and the District Court had to agree: "[1] that [RTMS] is likely to succeed on the merits, [2] that [RTMS] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). All four *Winter* factors must be satisfied. *Id.*

The decision to grant or deny a preliminary injunction is committed to the sound discretion of the District Court. *Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989). A preliminary injunction is reviewed for abuse of discretion. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021). The District Court will have abused its discretion if

it rests "on a clearly erroneous finding of a material fact or misapprehends the law with respect to the underlying issues in litigation." *Id.* The injunction will not be disturbed, however, absent abuse of discretion "regardless of whether the appellate court would, in the first instance, have decided the matter differently." *Quince Orchard*, 872 F.2d at 78. ["R]ather, [the Court] must determine whether the [district] court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *United States v. Mason,* 52 F.3d 1286, 1289 (4th Cir. 1995).

Abuse of discretion is a deferential standard, and so long as "the district court's account of the evidence is plausible in light of the record viewed in its entirety, [the Court] may not reverse," even where "convinced that . . . [the Court] would have weighed the evidence differently." *Mt. Valley Pipeline, LLC v. 6.56 Acres*, 915 F.3d 197, 213 (4th Cir. 2019) (citation and quotation omitted). The District Court's findings of fact would be clearly erroneous only if this Court "is left with the definite and firm conviction that a mistake has been committed." *League of Women Voters of N.C. v. North Carolina,* 769 F.3d 224, 235 (4th Cir. 2014) (quotation omitted).

On disputed facts, an in-person, evidentiary hearing allows a district court to weigh the evidence, balance the equities of the case, and make credibility determinations. *Mike's Train House, Inc. v. Broadway Ltd. Imps., LLC*, 708 F.

15

Supp. 2d 527, 531 n.3 (D. Md. 2010); *Clearone Advantage, LLC v. Kersen*, No. JKB-23-03446, 2024 U.S. Dist. LEXIS 114508, at *1 (D. Md. 2024). The court's credibility determinations "are deserving of the highest degree of appellate deference." *Teleguz v. Zook*, 806 F.3d 803, 812 (4th Cir. 2015). When findings are based on its decision "to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985). In reviewing a preliminary injunction determination, the Fourth Circuit has determined that "we are legally obligated to decline [any] invitation to 'reweigh the evidence presented to the district court,' as that is not our function." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 214 (4th Cir. 2024) (citing *United States v. Charleston Cty.*, 365 F.3d 341, 349 (4th Cir. 2004)).

Legal conclusions are subject to de novo review. *Pashby*, 709 F.3d at 319. More particularly, the Court would have to find the District Court made an error of law or misapprehended the law with respect to the underlying issues in litigation to vacate the injunction. *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021).

## **ARGUMENT**

The District Court crafted a narrow injunction that maintains the status quo and imposes no appreciable burden on PCC. JA993-1019. The injunction allows PCC to compete fairly with RTMS. JA891, JA993-994, JA1005. In fashioning discrete injunctive relief to ensure fair competition, the District Court properly concluded that RTMS was likely to succeed on the merits of its Unfair Competition and Tortious Interference with Contractual Relations claims. JA1006.

Where multiple causes of action are alleged and pursued, the movant "need only show likelihood of success on one claim to justify injunctive relief." *XL Specialty Ins. Co. v. Truland*, 2014 U.S. Dist. LEXIS 119096, 2014 WL 4230388, at *2 (E.D. VA. Aug. 21, 2014); *Variable Annuity Life Ins. Co. v. Coreth,* 535 F. Supp 3d 488, 494 n. 3 (E.D. Va. 2021) (internal quotations and citations omitted).

### A. **The District Court Crafted a Narrowly Tailored Injunction to Return the Parties to the Last Uncontested Status.**

The District Court's preliminary injunction was a well-restrained exercise of discretion and judgment, which considered the equities of this case and the substance of the legal issues it presents. *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580-81 (2017) (internal citation omitted).  Here, the District Court ensured that the preliminary injunction was "no more burdensome to the defendant than necessary to provide complete relief to the plaintiff[]." *Roe v. United States DOD,* 947 F.3d 207, 231 (4th Cir. 2020) (quoting *Madsen v. Women's Health Ctr,*

*Inc.*, 512 U.S. 753, 765 (1994)); *Morrison v. Garraghty*, 239 F.3d 648, 656 (4th Cir. 2001). As the record reflects, PCC's strangulation of patients' EHRs crippled RTMS's ability to compete and impacted SNFs and their vulnerable patients despite a more than decade long peaceable relationship with PCC. JA178, JA1013, JA1418-1420.

The working relationship with PCC as an EHR platform changed when PCC entered the value-based care/patient analytics market as an RTMS competitor, worsening after PCC unilaterally ended merger/acquisition discussions. JA997-998. RTMS was forced to file suit and once again PCC pulled back its indecipherable CAPTCHAs. JA137, JA555, JA1408-1451. In late May 2024, five months after the lawsuit was filed, PCC inaugurated an even more aggressive chokehold, interrupting RTMS's business operations and adversely impacting the healthcare provided at 607 SNFs, in Maryland alone, 103 SNFs were impacted. JA137-139.

When PCC could not justify its new predatory chokehold or corresponding adverse impact, the District Court restored the status quo—that is, the parties were once again, as they had been, free to compete on price, quality, and service on their respective, value-based care/patient analytics without PCC's unlawful behavior. PCC cannot point to any appreciable burden imposed by the injunction other than its desire to compete unfairly.

**B. RTMS Is Likely to Succeed on Its State Tort Law Claims for Unfair Competition.**

    *1. Unfair Competition and Restraints of Trade Have Deep Roots in Maryland Common Law.*

Unfair competition and restraints of trade have deep roots in Maryland common law. *Grempler v. Multiple Listing Bureau*, 258 Md. 419, 425 (1970). Almost 100 years ago, the Maryland Supreme Court securely anchored unfair competition to violations of public policy:

> Competition is the state in which men live and is not a tort, unless the nature of the method employed is not justified by public policy, and so supplies the condition to constitute a legal wrong.

*Goldman v. Building Ass'n*, 150 Md. 677, 684 (1926). "Public policy is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good, which may be termed, as it sometimes has been, the policy of the law, or public policy in relation to the administration of the law." *Assanah-Carroll v. Law Offices of Edward J. Maher, P.C.*, 480 Md. 394, 432 (2022).

"Acts that can constitute unfair competition include those that 'substantially interfere[] with the ability to compete ... or conflict [] with accepted principles of public policy.'" *Brightview Grp. v. Teeters*, 441 F. Supp. 3d 115, 134-35 (D. Md. 2020) (quoting *Paccar Inc.,* 905 F. Supp. 2d at 691). Similarly, when "unfair business practices are present, then 'equity will grant protection against the

19

offending party.'" *Baltimore Bedding Corp. v. Moses*, 182 Md. 229, 237 (1943). By harming RTMS, affecting SNFs and their patient populations, PCC has accomplished both: substantially interfered with RTMS's ability to compete and offended several traditional notions of public policy beyond the public policy of the Act, supporting the District Court's grant of protection from the offending party.

It has long been the public policy of Maryland to protect healthy competition between competitors through its unfair competition laws. *Grempler*, 258 Md. at 430. "[An] unreasonable and unfair restraint on trade" offends that policy to protect the public through fair competition and such restraints on trade "are prohibited." *Trimed, Inc. v. Sherwood Med. Co.*, 722 F. Supp 879,884 (D. Md. 1991) (quoting *Grempler*, 258 Md. at 424).

A statute is generally recognized as a dispositive statement of public policy. *See generally, Arundel Corp. v. Marie*, 383 Md. 489, 503-04 (2004) (citations omitted). The Act makes a strong statement of public policy that is evidenced by the efforts of Congress to codifying open access to enhance patient care and treatment and to prevent blocking of electronic patient health information ("EHI"). Congress designed the Act to "foster safe and 'open access, exchange, and use of [EHI].'" JA1007.

2. *Under the Maryland Common Law Tort of Unfair Competition, No One Is Justified in Damaging Another's Business Through Unfair Methods.*

The tort of unfair competition is extremely broad under Maryland law and its application to each set of facts and circumstances is highly flexible. *G. W. Aru, LLC v. W. R. Grace & Co.-Conn.*, 344 F.R.D. 446, 450 (D. Md. 2023) (citation omitted); *Balt. Bedding Corp.*, 182 Md. at 237. Neither fraud nor deceit are required to prevail. *Paccar Inc.,* 905 F. Supp. 2d 675; *Mascaro v. Snelling & Snelling of Balt., Inc.*, 250 Md. 215, 232 (1968) ("proof of fraudulent deception [is] no longer essential for relief."). Nor is an independently unlawful act required. *Trimed, Inc. v. Sherwood Med. Co.*, 977 F.2d 885, 891 (4th Cir. 1992).

The factors informing an unfair competition claim do include damaging or jeopardizing another's business by "unfair methods of any sort." *Balt. Bedding Corp.*, 182 Md. at 237. "Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception. Wherever, in any case, these elements of fair trade are found to be lacking equity will grant protection against the offending party." *Id.* at 237. Even so, in the context of this case, unfair competition is best understood to cover those acts (1) that substantially interfere with the ability of another to compete on the merits of their products; (2) taken to exclude another from the marketplace or damage another as a competitor; or (3) that "conflict[ ] with accepted principles of public policy" recognized by statute or common law.

21

*Paccar Inc.*, 905 F. Supp. 2d at 692-93 (quoting *Restatement (3d) Unfair Competition* § 1 (1995)).

> 3. *The District Court Did Not Abuse Its Discretion or Commit Clear Error When It Found Facts That Exposed PCC's Unfair Competition with RTMS.*

First, PCC does not dispute that its CAPTCHAs are indecipherable and further that the CAPTCHAs block RTMS's authorized access to PCC's EHR platform. JA756, JA1014. Nor does PCC deny that RTMS has suffered complete service interruptions as a result of PCC's conduct, impacting hundreds of SNFs and their vulnerable patients. JA1008.

To justify the indecipherable CAPTCHAs, PCC relied upon vague and ambiguous security and performance concerns, hiding behind the Act's exceptions to information blocking, which PCC could not support with documentary evidence or corroborate with witness testimony. *See* 45 C.F.R. § 171.203 and 45 C.F.R. § 171.205. As the District Court found, PCC never objected to RTMS's use of automated bots during its long-standing access to PCC's EHR platform. JA997-998. Despite the Act's enactment in 2016, PCC did not object even during the merger/acquisition discussions. JA404-406, JA864-865. It is only in the face of this lawsuit that PCC ran to exceptions in the Act. PCC's reliance on those exceptions at this late hour demonstrates the contrivance of its arguments.

a. Security Exception

PCC first offered its "Bot Prevention Policy" (which the District Court considered and described) to explain its displacement of RTMS from the value-based care/patient analytics marketplace. JA1010-1012, JA1099-1106. Even if PCC could use the Act's exceptions as a shield from unfair competition liability, it first would have to articulate a valid security protocol. JA1002-1003.

The District Court found three fatal flaws with PCC's alleged bot prevention policy: (1) PCC could not establish the document was the operative policy; (2) PCC did not follow the policy even if the document was in fact the operative policy; and (3) the policy provides no evidence how it complies with the law, its self-serving statement that it does to the contrary. JA1001-1003. At the evidentiary hearing, PCC called its Senior Vice President of Software-as-a-Service Engineering and Operations, Bachar Fourati to explain PCC's bot prevention policy. JA681. But he could not. First, Mr. Fourati, could not support PCC's counsel's representation to the District Court that the Bot Prevention Policy is the operative policy. JA758-762, JA1001. Second, Mr. Fourati could not explain how or when revisions to the PCC policy were made despite a patent conflict on the face of the document regarding various version dates. JA758-762, JA1001. Third, Mr. Fourati could not explain how PCC ensured that its policy complied with relevant law. JA791. He was questioned about the representations in the policy

23

regarding compliance with the security exception of the Act. JA790. Mr. Fourati

could not explain how PCC ensured compliance or who within PCC was

responsible for compliance. JA791-792. In the end, Mr. Fourati admitted that PCC

did not comply with its own policy. JA765-768. Nor could Mr. Fourati identify a

security breach that RTMS had caused (JA781-782) or security protocols that

RTMS has bypassed (although he had, under oath in his affidavit written that

RTMS had elected to bypass PCC security protocols). JA813-814.

###### b. Health IT Performance Exception

Mr. Fourati was also asked to explain how RTMS adversely impacted the

performance of PCC's EHR platform. JA771, JA782, JA1003. However, PCC

could offer no evidence that RTMS's access caused performance degradation.  Mr.

Fourati testified that PCC had experienced many incidents of performance

degradation and created incident reports each time; but neither Mr. Fourati nor

PCC could connect alleged performance degradation events to RTMS's activity.

JA688-689, JA691-692. As the District Court noted, PCC offered only one chart

from one day, which showed "slow" data retrieval it tied to RTMS's activity

despite Mr. Fourati testimony that incident reports were created to track every

incident. JA1003. Nor could Mr. Fourati explain how bot activity used to pull

patient information (i.e., the method RTMS has employed within PCC's platform

for more than a decade) affected "the performance of a system the size of PCC's."

JA1003. What Mr. Fourati did concede was that PCC's server space was limited by PCC's internal decision-making. JA686, JA807-809, JA1003.

Mr. Fourati was also questioned about PCC's adherence to the content and manner exception to the Act. JA790. The policy stated: "PointClickCare will rely on the content and manner exception under the Cures Act to otherwise fulfill any request to access, use or exchange EHI that is impacted by the operation of this policy." As with the security policy, he could not explain how PCC ensures compliance with the exception. JA790-791.

In the end, the District Court did not find Mr. Fourati credible:

> Keeping in mind the size of PCC's own operations—one that pushes out prescriptions for over one million patients in a day— the Court cannot simply take Fourati's word for it that automated software use akin to that of Real Time makes a material difference in PCC's performance.

JA1009.

### 4. The District Court Did Not Misapprehend the Law of Unfair Competition When It Found RTMS Likely to Succeed on the Merits of that Claim.

While each claim of unfair competition rises or falls on its own facts and circumstances, that focus does not add layers of complexity in analyzing an unfair competition claim. There is no difficulty here identifying the boundary between legitimate market participation and the unfair methods employed by PCC to

prevent RTMS from legitimately competing against it in the value-based care/patient analytics market.

PCC asks this Court to answer the wrong question. The question is not, can the Act ground an unfair competition claim, it can, for the reasons set forth herein. The correct question is "can PCC as a Real Time competitor abuse and exploit its independent role as an EHR platform to render Real Time unable to compete against it in the value-based care/patient analytics market?" The Act—governing PCC's status as an EHR platform—does not provide PCC any cover as a competitor to RTMS in the value-based care/patient analytics market. Just the opposite is true. The Act does not shield or authorize anti-competitive, predatory behavior, rather it brings that predatory behavior into sharp relief and removes any possible question about the legitimacy of PCC's actions.

The amicus brief also misses the anti-competitive, unfair competition question. As membership organizations, the amici are disengaged from meaningful competition, much less engaged in competition within the value-based care/patient analytics market. Discounting their parroting of PCC's arguments, the amici have raised no defense to PCC's unfair competition. Nor could they argue that the flattening of competition is grounded in favorable public policy. That the organizations have ignored such a central issue renders suspect their arguments.

PCC would like to confine the appellate argument to an academic discussion about the scope of the Act and its application to an EHR platform, just as it did at the evidentiary hearing. Any such discussion is purely academic, however, because PCC's behavior of displacing a rival competitor in the value-based care/patient analytics market stands front and center whether the Act applies or not.

First, PCC's great protest as an EHR platform over "bots" is at best self-inflicted and at worst a very thinly veiled deception to recharacterize its predatory, anti-competitive behavior against RTMS as statutorily approved privacy protections under the Act. As the District Court explained, PCC as an EHR platform has available to it two alternatives to quiet its generalized concerns about "bots" assuming those concerns are real (PCC did not substantiate those concerns generally, much less against RTMS specifically). JA999-1000. PCC could eliminate RTMS's "bot" activity if PCC were to export the patients' EHRs to RTMS for a fee. JA999-1000. To date, PCC has not been willing to do so. JA1000. And, it is apparent from this unwillingness why: an export of data would level the playing field, not force RTMS from the market as PCC has done through the complicated maze of indecipherable CAPTCHAs, new passwords and customer-provider IDs. PCC would, of course, no longer have a suspect security argument to mask its misconduct. With an export of patients' EHRs, PCC's boot would be off

the neck of RTMS and the two competitors would have to compete fairly on price, quality, and service of their value-based care/patient analytics products.

Ending without explanation the merger/acquisition discussions (JA1014), and rejecting an export-for-fee arrangement proposed by RTMS (JA999-1000), PCC presented to RTMS non-negotiable API terms. The District Court properly questioned the legitimacy and sincerity of that purported "solution." JA1014-1015.

When RTMS presented a marked-up version, PCC never responded. JA851-853, JA1117-1135. The terms required RTMS to give PCC proprietary rights to RTMS's value-based care/patient analytics product (JA592-594, JA1000); included a unilateral, non-recourse right to terminate the relationship at any time for no reason (JA1000, JA1054); precluded competition with PCC after termination (JA1000, JA1128-1129); and provided only 30% of patients' EHRs needed to fulfill its customer contracts, among other untenable terms. JA132, JA454-455, JA471-472, JA509, JA516, JA592-594. In other words, PCC would contractually put RTMS out of business. JA132-143, JA509-510, JA516-517, JA592-594. The District Court was right to question what competitor would ever agree to such an anti-competitive arrangement. JA1000.

PCC's arguments in connection with the Act ignore the full complement of facts that evidence the multiple ways PCC has abused its role as an EHR platform to displace a competitor. As discussed above, PCC has no answer to these facts.

28

PCC also misses something fundamental about the information it stores but does not own: no pixie dust was sprinkled by Congress and nothing magical occurred when patients' medical records were digitized such that PCC could now horde that information to drive out a rival.

The patient's chart remains the patient's chart. JA397-398, JA482, JA848-849. The only apparent difference would be the manner and method of storing the patient's chart, which has shifted from paper in a metal filing cabinet to an electronic filing cabinet on PCC's EHR platform. JA417.

When the patient's chart was paper, the nursing facility physically stored the chart and authorized access to the members of the healthcare team. As evidenced by the public policy language of the Act, that access and the SNF's authority over that access did not change, with the Act recognizing open access equals enhanced patient care. 21st Century Cures Act: Interoperability, Information Blocking, and the ONC Health IT Certification Program, 85 Fed. Reg. 25642, 25643 and 45 C.F.R. § 170-71, 7424-01(2020); 43 U.S.C. 300jj-53.

PCC's blocking of a competitor's access to drive that competitor out by monopolizing its own EHR platform represents "the dirty trick" underlying unfair competition. *Grempler*, 258 Md. at 426 ("On the simplest conceptual level, the law of unfair competition seeks to prevent people from playing dirty tricks.") (internal citation omitted). PCC has wrongly elected to use its "power to command and

control traffic" in patient health information in the EHR market to restrain RTMS's trade in the value-based care/patient analytics market where 80% of RTMS's customers store patients' EHRs with PCC.

This is not mere competition; it is a prohibited restraint of trade that Maryland law condemns that would still be unlawful behavior even if the Act had never annunciated the public policy of open access to enhance patient care. Stripping PCC of its self-importance as an electronic filing cabinet, and returning it to a physical warehouse of paper charts, blocking RTMS would still be anti-competitive and predatory conduct. Imposing indecipherable CAPTCHAs and forcing new passwords and user IDs is materially no different than changing a warehouse lock and the alarm code. PCC's behavior is not magically transformed by the change from paper to an electronic record.

It is the intentionally harmful chokepoint that is at issue—that PCC's stranglehold was initiated through indecipherable CAPTCHAs and triggered an examination into the Act does not obscure what PCC has done to displace RTMS from the marketplace while enjoying unfettered access as a competitor to patients' EHRs. JA993-1018.

## C. The Proposition Underlying PCC's Veiled Preemption Argument Is an Incorrect Statement of Law.

PCC argues, as the amici curiae, that a violation of the Act cannot form the basis for an unfair competition or intentional interference claim because there is no

30

private cause of action under the Act, and two, because of the interplay between the Act and other statutes, such as HIPAA and HITRUST. Neither is correct.

There is neither express preemption as the Act makes no mention of preempting state tort or contract claims, nor is there field preemption such as there is an intent of Congress to so occupy the field as to preempt all state laws. *College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (E.D.Va. 2004). Leaving then the doctrine of conflict preemption, PCC would have to demonstrate that the Act directly conflicts with state law, or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 596 (citations omitted). PCC has made no such showing as there is clearly no direct conflict between the Act and the state common law torts sued on by RTMS such that it would be impossible to comply with both. *Id.* Nor do the state common law torts pose an obstacle to the stated objectives under the Act—which are "to foster safe and open 'access, exchange, and use of electronic health information.'" JA1007 citing the Act. PCC offers no explanation as to "how these statutory purposes would be compromised by [RTMS] pursuing … tort claims against [PCC]." *College Loan Corp.* at 597.  Nor does PCC explain how the regulatory scheme regarding information blocking preempts state laws. "The presumption against preemption is even stronger against preemption of state remedies, like tort recoveries, where no federal remedy exists." *Abbot v. American Cyanamid Co.,*

844 F.2d 1108, 1112 (4th Cir. 1988) (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 251 (1984)).

That there is no private cause of action under the Act also does not "compel the conclusion that [RTMS's] pursuit of its state law claims, relying in part on violations of [federal statute] or its regulations, will obstruct the federal scheme." *College Loan Corp.* at 598. PCC's and amici curiae's arguments to the contrary fail. "[T]he lack of a statutory private right of action does not, in and of itself, bar a plaintiff from relying on violations of that statute as evidence supporting a state law claim. … Furthermore, we have specifically recognized that, absent preemption, an injured plaintiff may sue under state law seeking redress for a violation of a federal regulation." *Id.* at 599; *see Bland v. Educ. Credit Mgmt. Corp.,* ELH-11-02812, 2012 U.S. Dist. Ct. 23006, *15-16 (D.Md. 2012) (finding that the federal statute did not preempt plaintiff's Maryland law tort claims).

The court in *Intus Care, Inc. v. RTZ Assoc., Inc.*, 2024 U.S. Dist. LEXIS 100190 (N.D. Cal. 2024) came to the same conclusion in addressing whether a violation of the Act could form the basis for a state law tort claim. The court, denying a motion to dismiss, held that it was "of no moment" that there was no private cause of action under the Act, as violation of the statute satisfied the independently wrongful requirement of the tort claim. *Id.* Improper conduct, such as violation of a statute, is independently wrongful or unlawful and will support a

32

claim of tortious interference with economic relations under both California and Maryland law. *See Kramer v. Mayor & City Council of Baltimore,* 124 Md. App. 616, 638 (1999).

PCC relies upon *Waypoint Mgmt. Consulting, LLC v. Krone*, 2022 U.S. Dist. LEXIS 119764, at *169-70 (D. Md. July 6, 2022) to argue that RTMS cannot predicate a state law claim on the Act. The *Waypoint* decision provides no support for this argument. The *Waypoint* court, in analyzing the unfair competition claim, found that there is no caselaw that suggested such a claim could be predicated on a violation of an SEC regulation that imposed no liability on the defendant. *Waypoint Mgmt Consulting* at *167-168. Regardless, the court did not find that summary judgment was appropriate on this count. *Id.* at *169.

Numerous jurisdictions have relied upon public policy premised on federal statute or regulation to support state law claims. *See, e.g., Kanagy v. Fiesta Salons*, 208 W. Va. 526 (2000) (citing *Meury v. Connie Kalitta Servs./Am. Int'l Airways*, 181 F.3d 102 (6th Cir. 1999) (finding public policy premised upon federal aviation regulations for a *Harless*-type claim where safety violations were reported to FAA); *Barela v. C.R. England & Sons, Inc.*, 197 F.3d 1313 (10th Cir. 1999) (relying on both state and federal commercial trucking regulations in finding that the plaintiff asserted a clear and substantial public policy where the plaintiff had raised concerns about violations); *Boyle v. Vista Eyewear, Inc.*, 700 S.W.2d 859

(Mo. Ct. App. 1985) (finding a wrongful discharge claim existed where the plaintiff reported violations of federal eyeglass testing regulations); *Allum v. Valley Bank*, 970 P.2d 1062 (Nev. 1998) (finding public policy based upon FHA rules and regulations for a Nevada employee who refused to process loans in violation of those laws); *Coman v. Thomas Mfg. Co.*, 381 S.E.2d 445, 447 (N.C. 1989) (recognizing public policy based upon federal DOT regulations regarding hours of permitted driving where employer discharged an employee where employee refused to exceed the hours permitted under those regulations)). Maryland is no different. The distinction Maryland draws rests on the existence *vel non* of a private cause of action available to a plaintiff under federal law. If a private cause of action exists in the federal statute, the public policy within that federal statute cannot support a state law claim. But the opposite is also true. If a plaintiff has no private right of action under the federal statute, the policy underlying the federal statute can support the state law claim.

In *Magee v. Dansources Tech. Servs.*, Magee brought claims against her former employer. 137 Md. App. 527, 534 (2001). The trial court granted summary judgment to the employer. The Supreme Court of Maryland reversed. *Id.* Relying on *Makovi v. Sherwin-Williams*, 316 Md. 603 (1989), the Supreme Court found that Magee's abusive discharge, state law claim would not lie "when the public policy violated by the discharge arises from a statute that provides it owns remedy for the

34

violation, because a separate tort action would be unnecessary in that situation"
*Magee* at 567-68. But the Supreme Court also relied upon *Watson v. Peoples Sec.
Life Ins. Co.*, 322 Md. 467 (1991) for the proposition that *Makovi* was limited and
would not apply where the abusive discharge violated more than one public policy:
where one public policy source in a law does not provide its own remedy, an
abusive discharge action may be based on that unremedied violation (known as the
*Watson* exception). *Magee* at 568-69.

Magee relied upon three sources of public policy to support her state law
claims: (1) Fair Labor Standards Act; but the FLSA provided her adequate
remedies (*id.* at 570-71); (2) federal documentation requirements for Immigrant
Workers; but that too provided Magee with a civil remedy and procedure for that
violation (*id.* at 571-72); and (3) the Federal Law Against Health Care Benefit
Fraud. Magee argued she was discharged for not violating the Health Care Benefit
statute, which made it a crime to knowingly defraud a health care benefit program.
*Id.* at 572. Because that statute provided no civil remedy to Magee that would give
her redress for the adverse employment actions, her state law claims based on that
statute fell outside the *Makovi* rule, and she was permitted to proceed if she could
show a causal nexus between the public policy and her employer's decision to
discharge her. *Id.* at 573.

35

Even if the Act preempted claims for information blocking by affording a private right of action to RTMS, RTMS's claims for those other categories of anti-competitive, predatory conduct would not automatically be preempted as is evidenced by the Court's treatment of federal acts that involve federal unfair competition: the Lanham Act (infringement of trademarks and related marks; federal unfair competition causes of action for false association and false advertising) (15 U.S.C.S. §1125(a)) and the Copyright Act. Maryland unfair competition claims have proceeded together in the same lawsuits with Federal unfair competition claims. *See Pacesetter Homes, Inc. v. GBL Custom Home Design, Inc.*, 2021 U.S. Dist. LEXIS 154843, at *18 (D. Md. Aug. 17, 2021) (citing *Rosciszewski v. Arete Assocs., Inc.*, 1 F.3d 225 (4th Cir. 1993) and *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655 (4th Cir. 1993) (Maryland unfair competition claim not preempted when it contains an extra conduct that is qualitatively different from a federal copyright infringement claim).

With roots in the common law, *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 861 n. 2 (1982) ("the purpose of the Lanham Act was to codify and unify the common law of unfair competition and trademark protection"). A violation of the Lanham Act and in violation of Maryland common law of unfair competition, on the same facts and circumstances, are "based upon the same legal test." *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 2d 648, 659

(D. Md. 2013) (citing *Scotch Whisky Ass'n v. Majestic Drilling Co.*, 958 F.2d 594, 597 (4th Cir. 1992).

And yet, despite the similarity of legal tests for violations of federal statute and common law, and despite a private right of action available for violations of the Lanham Act, the statutory claim and the unfair competition claim nevertheless proceed together, side by side. *See Putt-Putt, LLC,* 936 F. Supp. 2d at 659; *Original Dells, Inc. v. Soul 1 Ent. Grp.*, 2024 U.S. Dist. LEXIS 159356, at *23 (D. Md. Sep. 5, 2024) (motion to dismiss denied); *Farm Fresh Direct By a Cut Above, LLC v. Downey*, Civil Action No. ELH-17-1760, 2017 U.S. Dist. LEXIS 178190, at *25 (D. Md. Oct. 26, 2017).

Similarly, the Copyright Act also does not automatically preempt a common law unfair competition claim even though it too provides a private right of action and captures conduct once governed exclusively by the common law. *See* 17 U.S.C. § 504(c)(1).

In the face of both federal claims based on copyright and common law unfair competition involving copyrights, the Fourth Circuit will not find preemption of state law claims that "incorporate elements beyond those necessary to prove copyright infringement" and "regulate conduct qualitatively different from the conduct governed by federal copyright law." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir. 1993).  A state law claim will avoid preemption

when the claim contains an "extra element" that changes the nature of the state law action so that it is "*qualitatively* different from a copyright infringement claim." *Rosciszewski,* 1 F.3d at 229-30 (italics in original).

Here, even if the Act provided a private cause of action, that federally authorized claim would not resolve the "qualitatively different" unfair competition claim. Rather, that misconduct established in the record would be captured by common law claims even if an "extra element" was required. The Act therefore does nothing to prevent the common law claim of unfair competition from proceeding against PCC.

### D. RTMS Is Likely to Succeed on Its State Tort Law Claim for Tortious Interference with Contractual Relations.

To make a showing of the likelihood of success on that claim, RTMS needed to adduce evidence in support of the following elements: (1) the existence of a contract between RTMS and a third party (here, SNFs); (2) PCC's knowledge of that contract; (3) PCC's intentional interference with that contract; (4) hindrance to RTMS's performance of the contract; and (5) resulting damages. *Total Recon Auto Ctr., LLC v. Allstate Ins. Co.*, 705 F. Supp. 3d 510, 517 (D. Md. 2023) (citing *Fowler v. Printers II, Inc.*, 89 Md. App. 448 (1991); *Macklin v. Robert Logan Assocs.*, 334 Md. 287 (1994); *Lake Shore Invs. v. Rite Aid Corp.*, 67 Md. App. 743 (1986)).

This tort does not require PCC's interference to have caused a breach of the contracts between RTMS and its SNF customers. It can include a breach of contract, but "[p]roof of a breach of contract is not [ ] essential" to RTMS's likelihood of success on the merits of its tortious interference claim. *Lake Shore Investors*, 67 Md. App. at 748.

PCC's interference must have been wrongful or unlawful. *Traveler's Indemn. Co. v. Merling*, 326 Md. at 329 (1992). Wrongful conduct that grounds this tort is 'incapable of precise definition; and must be determined based on the facts and circumstances of each case." *Paccar, Inc.*, 905 F. Supp. 2d at 694. If PCC acts with the direct or indirect purpose of injuring RTMS, "it is a wrongful act, and therefore actionable." *Id.* Despite that flexibility afforded the District Court to define PCC's wrongful conduct, interference in this context unquestionably includes PCC's preventing RTMS from performing its existing economic relationship with its SNF customers. *Lake Shore Investors*, 67 Md. App. at 753 (citing *Restatement (2d) Torts,* § 766, comment k; W. Prosser and W. Keeton, *The Law of Torts,* § 129 (5th ed. 1984).

PCC does not dispute the interference; it knowingly interfered with the contracts between RTMS and the SNFs. Any denial of that fact by PCC at this point would be feckless. The District Court found that PCC serially impeded and disabled RTMS's access to patients' EHRs; deactivated access to its customers'

39

accounts through which RTMS had historically accessed that patient information; employed indecipherable CAPTCHAs to ensure RTMS had no access; and violated both state and federal laws governing and affording access to that information. JA1007, JA1410-1438.

The District Court correctly rejected a business justification for the interference and wrongful conduct as PCC's documents and testimony were found wanting.  "[A] court's dismissal of such conjecture did not constitute impermissible burden-shifting. It was proper for [appellee] to bear the burden of proving *its own* hardships, as such facts were 'peculiarly in [its] knowledge.' *See Smith v. United States*, 568 U.S. 106, 112, 133 S. Ct. 714, 184 L. Ed. 2d 570 (2013) (cleaned up)." *Steves & Sons, Inc. v. Jeld-Wen, Inc*. 988 F.3d 690, 721 (4th Cir. 2021). The District Court properly found that RTMS had met its burden of likelihood of success on the merits. Turning to PCC, the District Court then asked PCC to identify evidence in the record to support PCC's argument that it met the exceptions to information blocking. JA1008-1015. PCC's arguments in this regard all center on credibility of the evidence and witnesses. RTMS offered credible evidence that it was not degrading PCC's systems and that it does not pose a security risk. JA466, JA508, JA526. That the District Court, on the record before it, concluded that PCC's evidence was not credible (JA935-936, JA966) does not equate to an erroneous fact-finding or impermissible shifting of a burden.

40

### E. Neither the Security Nor the Feasibility Exception Excuse PCC's Information Blocking.

RTMS is not a security risk. JA465, JA508, JA522-523. In its Brief, PCC points to untethered allegations of security risk that were also unsupported at the hearing. PCC Brief at 69; JA798-801. With no evidence that any access by RTMS had been spoofed by a malicious actor, PCC raised the speculation of spoofing as a possible risk and therefore RTMS should be locked out. "[S]poofing is the process of pretending to be a different IP address than what you actually are." JA520. Taking PCC's argument that "there can be spoofing therefore RTMS should be blocked" to its illogical conclusion, PCC would block all authorized users from accessing its system because, as testified to by RTMS's CTO, any user—human or automated—can be spoofed. JA488-489, JA510-511. RTMS is not a malicious actor in any additional way either. JA526. Glaringly, PCC came forward with no security breaches that were attributable to RTMS throughout the decade plus that RTMS accessed PCC's systems with automated users. PCC presented no evidence that the preservation of the status quo—using decipherable CAPTCHAs, presented a security risk. JA781-782, JA794, JA798-799.

PCC posits that there are alternatives less convenient to RTMS to obtain the data. PCC Brief at 66. PCC states that RTMS could access and obtain the data through RTMS human users. PCC Brief at 4, 66. This position undercuts PCC's arguments that RTMS poses a security risk; that the District Court's injunction

stripped its property rights; or that the injunction forces PCC to provide the information on its "copyrighted arrangements." PCC objects to RTMS accessing patients' EHRs through automated users, not because RTMS is not paying for the data or that it is not authorized to access the data, but because by blocking access to automated users, PCC can force a competitor from the value-based care/patient analytics market. PCC's professed "significant constitutional problems" cannot be taken seriously.

There are no viable alternatives to accessing patients' EHRs if PCC will not simply export the data RTMS's customers store on PCC's EHR platform. RTMS's unrebutted testimony was that the use of humans to obtain the data, for example, which is kept in a format created by PCC, would require 450 full-time employees working 7 days a week to keep pace with automated users. JA509-510. This is not an alternative, such as that identified in *Molloy v. Metro. Transp. Auth.,* 94 F.3d 808 (2d Cir. 1996)*,* rather it is a death sentence to RTMS's business—a business, it should be repeated, PCC took no issue with an EHR platform until it entered the value-based care/patient analytics market as an RTMS rival. In *Molloy,* the Second Circuit found that the purchase of train tickets by visually impaired riders on board the train, through the mail or where there was a ticket clerk may have been less convenient than having ticket clerks at certain Long Island Railroad stations, it did not amount to an irreparable harm. *Id.* at 813.

Based on credible testimony, the District Court found that it was not feasible to use full-time employees rather than automated users to collect the necessary data to provide RTMS's interventional analytics. JA509-510. Mr. Miller testified that RTMS would not survive financially. JA510. He testified that the fee charged to SNFs for the service would be less than employing one individual to extract data. JA517. Mr. Miller confirmed that when RTMS logs onto PCC's EHR and is met with a CAPTCHA, a human attempts to solve the verification. JA448-449. RTMS's Chief Information Security Officer, Andrew Lister testified that it did not matter if RTMS used humans or bots to extract data as PCC was blocking RTMS's IP addresses and user IDs regardless. JA520, JA526, JA528, JA530-531, JA998. So, PCC's alternative is really no alternative at all, as the District Court agreed.

The District Court also considered and rejected PCC's API as a viable alternative, finding that it presented RTMS with "a classic Hobson's choice: either continue with its current operations and face the business interruptions associated with the unsolvable CAPTCHAs, or agree to alternative terms that effectively would put it out of business." JA592-594, JA1014-1015. RTMS's Chief Strategy and Development Officer, Timothy Buono, testified that the API precluded RTMS from offering any product that competed with PCC; PCC could cancel the agreement at its convenience; upon termination, RTMS would be precluded from

43

competing with PCC; RTMS had to affirm that PCC owned patients' EHRs; PCC had to approve how patients' EHRs were used by RTMS; and RTMS would be required to co-market its products with PCC. JA592-594. Mr. Buono testified that signing the API would put RTMS in breach with the SNFs contracts and RTMS out of business. JA593-594. And, the API would fundamentally destroy the nature of the data analytics that RTMS provides to SNFs: without patients' EHRs, life-saving data analytics provided by RTMS would cease doing business. JA437-438, JA474.

The API would provide RTMS less than 30% of the needed data to provide life-saving alerts. JA509. PCC claims that it is only obligated to offer data that is required under 45 C.F.R 171.301. PCC Brief at 10. This ignores that: 1) PCC first created the issue and then sought to hide behind the regulation to shield its unlawful behavior; 2) the data offered by PCC was only offered through the API, which, as the District Court found, offered an untenable Hobson's choice and would have put RTMS out of business; 3) would provide less than 30% of the data needed; 4) 45 C.F.R. 170.301 is a manner exception—meaning the format in which the information is to be transmitted and not the content; and 5) the USCDI manner default is only to be used under certain circumstances, which are not present here.

44

PCC has undertaken unlawful behavior that threatens the very existence of RTMS. To suggest, as PCC has, that RTMS has not been irreparably harmed because RTMS can accept limited, partial data provided that RTMS agrees to the onerous API would impermissibly lessen competition and allow PCC to hide behind exceptions to the Act.

PCC claims that RTMS could have opted to receive USCDI data, which would have prevented it from suffering 100% business interruption. PCC Brief at 67.  Leaving aside that this is a wholly unsupported statement, bereft of any evidence in the record, RTMS's CTO testified that USCDI data comprises less than 30% of patients' EHRs stored with PCC. JA509. The testimony was clear, and credited by the District Court, that this is insufficient information to perform live-saving interventional analytics. JA509, JA516. Relying on the undisputed evidence that RTMS depends on access to patients' EHRs stored with PCC, the District Court found credible RTMS's assertions that "continued use of indecipherable CAPTCHAs presents a real and imminent threat to the company's continued ability to do business." JA1017, JA437-438.

The cases cited by PCC offer no support to its available alternatives argument. The Fourth Circuit found in *HCI Techs., Inc. v. Avaya, Inc.*, 241 Fed. Appx. 115, 121 (4th Cir. 2007) that the district court did not err in holding that HCI had failed to demonstrate irreparable harm. The district court denied the injunction,

finding, among other facts, that HCI would not likely be driven out of business

because it could continue to sell and service products made by defendant and other

manufacturers. *Id.* The Fourth Circuit held that based on the record before the

district court, that court's findings of fact were not clearly erroneous. *Id.* PCC does

not explain how *HCI* supports it arguments.

　　*Hope v. Warden York Cty. Prison,* 972 F.3d 310, 333 (3rd Cir. 2020) also has

no application here. The Third Circuit found that the district court committed

numerous errors related to a mandatory injunction to release detainees from

detention centers in the early days of COVID-19. The Third Circuit held that given

the specific circumstances of the detentions and concerns surrounding the lack of

reporting requirements imposed on the detainees after release that the district court,

on remand, must consider alternatives to release. *Id.*

　　Here, the District Court considered alternatives and rejected them as not

viable. JA998-1001. PCC characterizes that fact finding, which did not go its way,

as a failure to consider alternatives. That the District Court heard evidence, rejected

the evidence of supposed alternatives and granted the injunction does not constitute

error.

　　The District Court also found that PCC was unwilling to find agreeable

terms with RTMS—not that it was unable. JA1013. Because PCC "inexplicably"

chose to end discussions around providing RTMS all patients' EHRs data and not

just a limited subset, PCC cannot credibly argue that it is technically unable to

provide the data and satisfy the manner exception. JA1013. Rather, the undisputed

testimony was that PCC could provide the entire patient healthcare record, whether

through a download (JA473, JA480) or through queries (JA481). Those queries

that RTMS and PCC were negotiating were based on extraction of data by

automated users. JA480-481. During these negotiations, PCC did not claim that

bots posed a security risk. JA466. As Mr. Miller testified, the issue never arose.

JA466. PCC only raised a feasibility concern after it ended communications

regarding the merger/acquisition and subsequently, the API. JA998. As the District

Court wrote, "[i]n a nutshell, PCC appears more unwilling than unable to reach a

mutually agreeable solution." JA1013.

### F.    PCC's Constitutional Arguments Are Equally Unavailing.

PCC claims that it can exclude RTMS from its computer systems. PCC Brief

at 54.  This argument ignores that RTMS is not an unauthorized user and it is not

"running harmful automated software on its system." This issue was considered

and addressed by the District Court finding that PCC "had introduced no evidence

that Real Time's activities are even associated with slowdowns beyond a single

day."  JA1009. Moreover, the District Court found that PCC's use of

indecipherable CAPTCHAS was not limited to the period of time "necessary to

47

resolve any negative impacts" as required by the Health IT Performance Exception. *See* 45 C.F.R. 171.205. JA1009-1010.

With regard to PCC's claim that its property rights have been stripped through a taking, PCC is paid for storing SNFs' patients' EHRs. JA204. PCC enters into contracts with SNFs, is paid by the SNFs to store the records and SNFs provide authorized access to their vendors, including RTMS. JA196-224. An unconstitutional taking must involve the government taking private property. *DSI Corp. v. United States,* 655 F. 2D 1072, 1074 (1981). RTMS does not have a contract with PCC as PCC refused to negotiate with RTMS. As stated hereinabove, PCC has a Bot Policy, which is suspect at best (given the testimony at the hearing) and PCC admitted that it does not enforce its policy, uniformly or at all. Further, PCC makes no effort to address the balancing test in *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 St. Ct. 2646 (1978).

Finally, PCC argues that it cannot be forced to provide the information on its copyrighted arrangements. PCC Brief at 56. Fundamentally, the information stored on PCC's systems does not belong to PCC. And, PCC is paid by SNFs for hosting patients' EHRs and for the access to those records. JA780-781, JA994. RTMS accesses patients' EHRs through the authorization of its SNF customers. None of these arguments warrant overturning the preliminary injunction.

48

### G. The District Court Did Not Abuse Its Discretion in Finding That the Equities Tip Sharply in RTMS's Favor.

#### 1. RTMS Would Be Irreparably Harmed Absent Relief.

PCC makes no more than a passing attempt to address the irreparable harm to RTMS if its access to patients' EHRs is blocked. Irreparable harm exists "where the moving party's business cannot survive absent a preliminary injunction." *Hughes Network Sys., Inc. v. Interdigital Commc'ns Corp.,* 17 F. 3d 691, 694 (4th Cir. 1994). "The permanent loss of a business, with its corresponding goodwill, is a well-recognized form of irreparable injury." *Steves & Sons, Inc. v. Jeld-Wen, Inc*., 988 F.3d 690, 719 (4th Cir. 2021).

The District Court had evidence before it that supported the finding of business interruption. JA474, JA477. RTMS testified that without access to patients' entire EHRs, which the District Court found that PCC never offered to provide, and the ability to provide its alerts, RTMS would be in breach of its contracts with the SNFs. JA1014-1016. PCC does nothing more than recite a litany of decisions discussing irreparable harm without providing analysis of how those decisions impact this appeal. None of the decisions PCC relies upon cast doubt as to the legal conclusions reached by the District Court or the appropriateness of the injunction.

In *Noya v. Frontier Adjusters, Inc.,* 2013 U.S. Dist. LEXIS 80672 (D. Md. June 7, 2013), the district court determined that injunctive relief was inappropriate

49

given plaintiff's delay in bringing suit and seeking the injunction, and because plaintiffs had not clearly shown imminent financial ruin as only one of thirteen franchise agreements with defendant was expiring and the locations affected by that agreement were to be sold. 2013 U.S. Dist. LEXIS 80672 *22-23. In *SAS Inst., Inc. v. World Programming Ltd.,* 874 F.3d 370 (4th Cir. 2017), the district court did not award a permanent injunction based largely on the almost $80million in damages plaintiffs was awarded, finding that "the future damages undermine [ ] its claim of irreparable injury moving forward." 874 F.3d at 386. The Fourth Circuit did not disturb the district court's findings, writing that "[b]efore this court, [plaintiff] has pointed to no evidence that the district court may have overlooked." *Id.* Here, the district court similarly did not overlook evidence, rather it weighed and credited testimony and evidence, finding based on the record below that absent an injunction, RTMS would suffer irreparable harm. JA1017.

Regarding other decisions cited by PCC, those decisions were all based on findings made by the court, exercising its discretion, that an injunction should not issue. PCC offers no explanation or analysis for how these decisions shed light on the District Court's findings here. These cases demonstrate that it is within the discretion of a district court to weigh the evidence and credibility of witnesses to determine whether the second *Winters* element has been met.

### 2. *The Balance of Hardships Favors RTMS.*

PCC's mischaracterization of the District Court's findings is acutely reflected in its arguments regarding the harm to PCC and the public. PCC Brief at 68-69. The District Court did not order a rollback of PCC's security systems that would threaten their stability. At the hearing, the District Court gave PCC every opportunity to demonstrate that RTMS's automated users have threatened its systems. JA706-707. The position PCC posits in its Brief is the same generalized, unsupportable and unavailing arguments as it did before the District Court. PCC Brief at 69. The District Court found that PCC presented no credible evidence that RTMS posed a security risk (JA1003) or that RTMS degraded PCC's systems. JA1003.

### 3. *The Public Interest Weighs in Favor of an Injunction.*

The public interest overwhelmingly weighs in favor of preliminary injunction. Contrary to PCC's argument, there are only competing interests that it has to harmonize because it is engaging in unlawful behavior. PCC produced no evidence that any patient has been put at risk, let alone 1.6 million patients, as a result of the injunction. The only harm to patients that was offered at the hearing was from the cessation of interventional analytics provided by RTMS to the healthcare team. JA399-400, JA438, JA565-568. PCC's reliance on *Human Touch DC, Inc. v. Merriweather,* 2015 U.S. Dist. LEXIS 186805 (D. Md. May 26, 2015)

does not substantiate PCC's view that the public interest weighs in its favor. There, defendant was terminated and shortly thereafter she sent herself email communications containing PHI. 2015 U.S. Dist. LEXIS 186805 *4. Although the court gave her an opportunity to come forward with evidence regarding possible whistleblower activities, she failed to do so. *Id*. at *13. The court, in the absence of evidence otherwise, granted the preliminary injunction. *Id*. at *16.

The public interest is not served by giving PCC free reign to decide that a member of a patient's healthcare team cannot access EHRs stored on its system. The same data that PCC collects and uses to provide its competing data analytics product to SNFs. The public is not served by unlawful, anti-competitive behavior. It is not disputed that the public is served by security measures employ by companies that store, transmit and use PHI, entities that are mandated by HIPAA to protect ePHI, there is no evidence here that the injunction opens the door to malicious actors.

## **CONCLUSION**

For the reasons stated above, the District Court did not abuse its discretion in granting RTMS's motion for a preliminary injunction and crafting the narrow injunctive relief that was granted. The District Court was correct in both factual finding and application of those findings to the laws of unfair competition and tortious interference with contractual relations that RTMS established that: (1) it is

likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the

preliminary injunction; (3) the balance of equities tips in its favor; and (4) the

injunction is in the public interest. *Winter*, 555 U.S. at 20.

    The District Court's preliminary injunction should be affirmed.

November 1, 2024                    Respectfully submitted,

                                         Rifkin Weiner Livingston LLC

                                         */s/ M. Celeste Bruce, Esq.*
                                         M. Celeste Bruce
                                         (cbruce@rwllaw.com)
                                         Michael T. Marr
                                         (mmarr@rwllaw.com)
                                         Madelaine Kramer Katz
                                         (mkatz@rwllaw.com)
                                         7700 Wisconsin Avenue, Suite 320
                                         Bethesda, MD 20814
                                         (301) 951-0150
                                         (301) 951-0172
                                         *Counsel for Real Time Medical Systems, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

This motion complies with the type-volume limitation of Fed. R. App. P. 32(a)(7), because it contains 11,971 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(a)(2)(B) and 32(f). This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

Date: November 1, 2024

*/s/ M. Celeste Bruce, Esq.*
M. Celeste Bruce
Michael T. Marr
Madelaine Kramer Katz
*Counsel for Real Time Medical Systems, Inc.*
