**No. 24-1773**

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

―――――――――

REAL TIME MEDICAL SYSTEMS, INC.

*Plaintiff-Appellee,*

v.

POINTCLICKCARE TECHNOLOGIES, INC.,
d/b/a PointClickCare,

*Defendant-Appellant.*

―――――――――

On Appeal from the United States District Court
for the District of Maryland,
No. 8:24-cv-00313-PX, Hon. Paula Xinis

―――――――――

### Appellant's Reply Brief

―――――――――

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036

Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002

Rod J. Rosenstein
Jeremy M. Bylund
 *Counsel of Record*
Amy R. Upshaw
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbylund@kslaw.com

*Counsel for PointClickCare Technologies Inc.*

November 15, 2024

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION ......................................................................... 1

ARGUMENT ............................................................................. 5

I.    The Cures Act Authorizes PointClickCare to Bar RTMS's Bots and Offer Standardized Alternatives ...................................... 5

    A.    The manner exception authorizes PointClickCare to block RTMS's bots ............................................... 6

    B.    Without a Cures Act violation, the district court's injunction must be lifted ........................................ 13

    C.    The district court's misinterpretation of the Cures Act raises grave constitutional issues ................................. 15

    D.    The IT performance and security exceptions further confirm that PointClickCare's bot prohibition is lawful ........................................................ 19

II.    The State-Law Claims Cannot Provide an Alternative Basis to Support the Injunction ...................................... 24

III.    The Remaining Preliminary Injunction Factors Favor PointClickCare .................................................. 30

CONCLUSION ........................................................................ 34

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## Cases

*Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*,
 650 A.2d 260 (Md. 1994) ........................................................ 29

*Baron Fin. Corp. v. Natanzon*,
 471 F. Supp. 2d 535 (D. Md. 2006) ...................................... 14

*Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*,
 622 F.3d 36 (1st Cir. 2010) .................................................. 31

*Campos-Chaves v. Garland*,
 144 S. Ct. 1637 (2024) ............................................................ 9

*Cedar Point Nursery v. Hassid*,
 594 U.S. 139 (2021) .............................................................. 17

*Di Biase v. SPX Corp.*,
 872 F.3d 224 (4th Cir. 2017) ................................................ 31

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
 499 U.S. 340 (1991) .............................................................. 18

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
 458 U.S. 141 (1982) .............................................................. 28

*Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*,
 566 F. Supp. 2d 460 (D. Md. 2008) ...................................... 29

*Jennings v. Rodriguez*,
 583 U.S. 281 (2018) .............................................................. 15

*Legend Night Club v. Miller*,
 637 F.3d 291 (4th Cir. 2011) ................................................ 34

*Magee v. DanSources Tech. Servs., Inc.*,
 769 A.2d 231 (Md. Ct. Spec. App. 2001) ............................ 26

*Makovi v. Sherwin-Williams Co.*,
 561 A.2d 179 (Md. 1989) ...................................................... 24

*Martello v. Blue Cross & Blue Shield of Md., Inc.,*
795 A.2d 185 (Md. Ct. Spec. App. 2002).............................14

*Mascaro v. Snelling & Snelling of Balt., Inc.,*
243 A.2d 1 (Md. 1968).............................30

*Molloy v. Metro. Transp. Auth.,*
94 F.3d 808 (2d Cir. 1996).............................31

*Moser v. Ford Motor Co.,*
28 F. App'x 168 (4th Cir. 2001).............................28

*Painter's Mill Grille, LLC v. Brown,*
716 F.3d 342 (4th Cir. 2013).............................28

*Parke-Hayden, Inc. v. Loews Theatre Mgmt. Corp.,*
1993 WL 287815 (S.D.N.Y. July 28, 1993).............................8

*Peyton v. Reynolds Assocs.,*
955 F.2d 247 (4th Cir. 1992).............................8

*Syndia Corp. v. Lemelson Med., Educ., & Rsch. Found., Ltd. P'ship,*
165 F. Supp. 2d 728 (N.D. Ill. 2001).............................16

*United States v. Hansen,*
599 U.S. 762 (2023).............................15, 19

*Waypoint Mgmt. Consulting, LLC v. Krone,*
2022 WL 2528465 (D. Md. July 6, 2022).............................24

**Constitutional Provisions**

U.S. Const. amend. V .............................18

**Statutes**

17 U.S.C. § 106.............................18

18 U.S.C. § 1030.............................15

42 U.S.C. § 300jj-52 .............................5, 27

**Regulations**

45 C.F.R. § 171.203 ................................................................. 21, 23

45 C.F.R. § 171.204 ..................................................................... 6, 12

45 C.F.R. § 171.205 ......................................................................... 19

45 C.F.R. § 171.301 .................................................................. *passim*

85 Fed. Reg. 25,642 (May 1, 2020) ............................................ *passim*

89 Fed. Reg. 1192 (Jan. 9, 2024) .......................................... 10, 11, 12

**Other Authorities**

Foretek, Jared
    *Judge Blocks Medical Records Co.'s Anti-Bot Captchas*,
    RWLLaw.com (July 29, 2024), https://tinyurl.com/bdeers27 ............ 33

Restatement (Second) of Torts (1979) ......................................... 25

Restatement (Third) of Unfair Competition (1995) ................................ 25

## INTRODUCTION

After obtaining an injunction premised on alleged violations of the federal 21st Century Cures Act, RTMS all but casts aside the district court's flawed reasoning. RTMS now contends that *regardless* of PointClickCare's compliance with the Cures Act, this Court should bless the district court's injunction granting RTMS free rein to run its contractually prohibited bots on PointClickCare's system. This Court should reject that argument, reverse the district court's order, and vacate the injunction.

PointClickCare is an electronic health information ("EHI") custodian that provides essential EHI services to care facilities across North America, serving more than a million residents. PointClickCare's priority is to ensure the security and stability of its software platform so those care facilities have access to the information they need to continue to provide life-saving services. Its activities are governed in part by the Cures Act, part of a federal legislative scheme that balances two competing interests—safeguarding EHI while also facilitating EHI exchange among practitioners. The Cures Act and its regulations promote that balance by encouraging EHI exchange and standardization.

The district court's injunction, however, disregards Congress's efforts at balance so that RTMS can run unauthorized bots to siphon information off of PointClickCare's servers.

The injunction cannot be squared with the Cures Act and its regulations, which classify PointClickCare's actions to safeguard patients' EHI as both "reasonable and necessary." The regulatory "manner exception" expressly authorizes EHI custodians like PointClickCare to provide EHI in a standardized, HHS-approved manner if the custodian cannot reach agreement with a requestor concerning a demand to provide that EHI in a nonstandard manner. The district court's injunction is explicitly premised on a misreading of the manner exception—but RTMS all but abandons the argument. RTMS does not dispute that the parties did not reach an agreement to allow RTMS to run its unauthorized automated bots. Nor does RTMS dispute that PointClickCare offered to provide EHI in the standardized manners identified by federal law. That alone warrants reversal.

Perhaps recognizing that its Cures Act argument is dead on arrival, RTMS now argues that it should win "whether the Act applies or not." Wrong. As a legal matter, both the unfair-competition and tortious-

interference claims require a plaintiff to prove that the defendant engaged in wrongful conduct. The district court expressly found that the wrongful conduct was a purported violation of the Cures Act—indeed, it recognized that RTMS's claims hinge on a Cures Act violation. This Court should thus decline to address alternative arguments that RTMS did not meaningfully advance and that the district court did not adopt.

In any case, RTMS's proposed alternative state-law theory offers no basis to punish PointClickCare when PointClickCare's actions are "reasonable and necessary" under the Cures Act and its regulations. Conduct that federal law deems "necessary" cannot simultaneously be wrongful under state law.

Finally, RTMS's fable of wrongdoing is not supported by the record or the district court's order. RTMS's story is based on clearly erroneous claims that PointClickCare did not put RTMS on notice of its bot prohibition and that PointClickCare's timing in enforcing its rights after merger talks failed suggests anti-competitive behavior. But PointClickCare's evenhanded use of anti-bot technology applies across the board—it does not target RTMS. As the district court found, PointClickCare has consistently prohibited *all* users of its system from

employing bots with an explicit contractual bar. RTMS has not identified *any* period during which PointClickCare did not explicitly bar third-party bots from its system.

RTMS knew about that prohibition and admits that it knowingly and repeatedly violated it. Despite acknowledging that it may use PointClickCare's systems only in the "same manner as authorized employees of" PointClickCare's nursing home customers, RTMS deliberately and knowingly circumvents the technical means—CAPTCHAs—PointClickCare deploys to enforce that anti-bot prohibition. Throughout the relevant period, RTMS employed "humans that solve" CAPTCHAs before turning the login sessions over to RTMS's automated bots. In so doing, RTMS places tremendous strain on PointClickCare's system—all without paying PointClickCare a dime.

If any party has engaged in misconduct, it is RTMS. Just because RTMS managed to successfully evade PointClickCare's technological barriers and violate PointClickCare's terms in the past does not give it a legal right to do so in the future. RTMS cannot succeed on its claims as a matter of law, and this Court should reverse.

## ARGUMENT

### I. The Cures Act Authorizes PointClickCare to Bar RTMS's Bots and Offer Standardized Alternatives.

Federal law expressly authorizes PointClickCare to bar RTMS's bots from its system, so RTMS's claims are likely to fail. The Cures Act authorizes EHI repositories to engage in "reasonable and necessary" activities as identified by HHS to ensure that patients' EHI remains safe, secure, and accessible. 42 U.S.C. § 300jj-52(a)(3). Instead of responding with analysis of the Cures Act and its regulations, RTMS devotes most of its brief to rhetoric in an unsuccessful effort to paint itself as a wronged altruist.[1] But that bombast only highlights the failure to respond on the law to PointClickCare's central argument: the Cures Act's implementing regulations *expressly authorize* EHI custodians such as PointClickCare to control nonstandard, disruptive, or dangerous third-party access to sensitive EHI.

---

[1] Indeed, as suggested during the hearing, RTMS's plan is monetizing patient EHI by reselling it to third parties like Provider Partners Health Plans. JA850.

## A.    The manner exception authorizes PointClickCare to block RTMS's bots.

Pursuant to statute, a federal regulation states that it is "reasonable and necessary" for an EHI custodian like PointClickCare to refuse nonstandard-access requests where (a) the custodian is technically unable to fulfill the request, or (b) the custodian cannot reach agreeable terms with the requestor.    In either circumstance, the custodian may instead satisfy the Cures Act's requirements by offering standardized access.  That "manner exception" thus expressly authorizes PointClickCare to reject RTMS's demand for nonstandard, contract-breaching automated-bot access, so long as it offers EHI in one or more standardized, HHS-approved manners.[2]  *See* PCC Br. 34-42; 45 C.F.R. §§ 171.301 & 171.204.   RTMS does not dispute that PointClickCare offered EHI in those alternative manners after the parties did not reach agreement.  That should end the case.

---

[2]  Contrary to RTMS's contention (at 40) that PointClickCare's arguments concerning the exceptions to information blocking "all center on credibility of the evidence and witnesses," PointClickCare's satisfaction of the manner exception turns entirely on undisputed facts concerning the parties' failed negotiations and PointClickCare's provision of two forms of standardized access.

Although PointClickCare made this argument first and most prominently in its brief (at 10-11, 34-42), RTMS hardly mentions the regulation. It makes only two conclusory arguments in response. RTMS first contends that the lack of agreement between RTMS and PointClickCare does not matter because it was not impossible for PointClickCare to agree to RTMS's terms. But that argument ignores what the regulation says. The manner exception applies whenever an EHI custodian "cannot reach agreeable terms with the requestor to fulfill the request in the manner requested." 45 C.F.R. § 171.301(a)(1). That inability to reach agreement is the "circumstance[]," RTMS Br. 44, that justified PointClickCare's alternative provision of standardized access. RTMS next argues (at 42, 43) that there are no alternatives to the manner of access it requested. But that position is likewise foreclosed by the regulation itself, which specifies the particular alternatives to which RTMS is entitled, 45 C.F.R. § 171.301(b).

**1.** PointClickCare and RTMS were unable to "reach agreeable terms" for PointClickCare to provide RTMS with EHI in the manner requested—*i.e.*, employing bots on PointClickCare's system. PointClickCare "first attempt[ed] to negotiate agreements" with RTMS

using "terms [PointClickCare] cho[se]." 85 Fed. Reg. 25,642, 25,877 (May 1, 2020). But after significant negotiation, the parties could not reach agreeable terms. Recognizing that the parties did not reach agreement, RTMS points to the district court's language that PointClickCare was "unwilling" rather than "unable" to reach agreement. RTMS Br. 46. But that argument misunderstands the law and the facts. *See* PCC Br. 38-39 (citing *Peyton v. Reynolds Assocs.*, 955 F.2d 247, 249, 253 (4th Cir. 1992)).

A party can decline to agree to another party's proposed terms even if it has the technical ability to fulfill them. For freedom of contract to have any meaning at all, it must include the freedom to walk away instead of agreeing to a bad deal. *See, e.g.*, *Parke-Hayden, Inc. v. Loews Theatre Mgmt. Corp.*, 1993 WL 287815, at *3 (S.D.N.Y. July 28, 1993) (under the "definition of freedom of contract" a party's recourse for bad-faith negotiations is "to walk away from the bargaining table").

The district court's incorrect view imposed on PointClickCare a duty to agree whenever agreement is technically possible, no matter how burdensome the other party's terms. Worse, the district court's demand that the parties reach agreement was one-sided: it expressly excused

RTMS from any duty to reach agreement on terms acceptable to PointClickCare. In fact, the district court found *PointClickCare*'s standard marketplace agreement—which governs its relationships with more than a thousand partners—too "onerous." JA1000. The district court nowhere explained why RTMS, the party demanding nonstandard access, should be excused from the duty to agree to PointClickCare's terms, but PointClickCare was obliged to give RTMS everything it wanted at whatever price RTMS chose to pay, down to and including $0.

Perhaps recognizing the weakness of this position, RTMS then appears to argue that the manner exception applies only if an entity like PointClickCare is "technically unable to provide the data" in the manner a requestor wants. RTMS Br. 47. But that, again, ignores what the law says. The manner exception is disjunctive—it states two alternatives, either of which suffices to excuse refusal to "fulfill a request for electronic health information in any manner requested." 45 C.F.R. § 171.301(a)(1); *see, e.g.*, *Campos-Chaves v. Garland*, 144 S. Ct. 1637, 1647 (2024) (explaining that when two conditions are joined by "or" in an enactment, satisfying only one of the two conditions suffices). A custodian need not fulfill a request for nonstandard access if the custodian "is technically

unable to fulfill the request *or* cannot reach agreeable terms with the requestor." 45 C.F.R. § 171.301(a)(1) (emphasis added).

That disjunctive test was no accident, as HHS made clear—the agency acknowledged two "instances when an actor *should not be required* to respond in the manner requested," 85 Fed. Reg. at 25,877 (emphasis added), one of which was technical inability and the other of which was an inability to reach an agreement. *See generally id.* (explaining the two alternative predicates for the manner exception). HHS wrote the agreement prong to provide custodians "flexibility to avoid developing one-off, unique, custom solutions unless the actor wants to do so." 89 Fed. Reg. 1192, 1384 (Jan. 9, 2024).

Nor is that all. The record shows that PointClickCare was willing to meet RTMS's demand to provide EHI through a nonstandard, custom solution tailored to RTMS's particular needs so long as RTMS compensated PointClickCare fairly. Contrary to RTMS's contention, PointClickCare did not "reject[]" RTMS's "request[]" for export or queries. RTMS Br. 9. Instead, PointClickCare offered to create a premium API specifically for RTMS that would allow it to access the data it needed without using bots. *See* JA596-597 (Tr.221:25-222:7).

10

As HHS recognized, such "one-off, unique, custom solutions" are "resource-intensive" and "costly" and can "inhibit investment in innovative, scalable approaches to interoperability and exchange." 89 Fed. Reg. at 1382, 1384. And so PointClickCare requested that RTMS pay it a reasonable fee for developing and providing that "costly," "resource-intensive," "one-off, unique, custom solution[]"—$125 per facility per month. RTMS refused. The problem, in short, was not any lack of willingness to accommodate RTMS's needs. Contrary to RTMS's assertion (at 42), the problem was that RTMS *did not want to pay* what PointClickCare determined was a reasonable amount, JA597 (Tr.222:14-16), JA607, gambling that it could instead just continue using bots on PointClickCare's systems for free.

**2.** PointClickCare satisfied its obligation to RTMS by offering to fulfill requests for EHI through the alternative manners outlined by law. RTMS complains that the product it designed and chose to build its business around requires that it be allowed to scrape whatever data it likes using its automated bots and that no alternative manner of access will do. *See* RTMS Br. 42-43. But HHS foreclosed that position in enacting the manner exception, which recognizes the particular strain on

11

EHI repositories posed by nonstandard access for which those systems were not designed. *See, e.g.*, 89 Fed. Reg. at 1382, 1384.

When PointClickCare "[could ]not reach agreeable terms with [RTMS] to fulfill [RTMS's] request" for nonstandard access, it "satisf[ied] the exception by fulfilling the request in an alternative manner." 85 Fed. Reg. at 25,877. PointClickCare offered USCDI data. JA289-290 ¶ 9; JA632 (Tr.257:6-8); JA1248-1254; *see* 45 C.F.R. § 171.301(b)(1)(ii). It also continued to provide standardized access to RTMS's human users—the ones not employing bots—that complied with the nursing facilities' contracts through its Part 170–certified system. *See* JA288-289 ¶ 6; JA630; JA641; *see also* JA532-534, JA641-642; *see* 45 C.F.R. § 171.301(b)(1)(i). RTMS does not dispute either of those facts.

In offering those two standardized forms of access, PointClickCare exhausted the manner exception. 45 C.F.R. § 171.204(a)(4)(ii). Consequently, under the Cures Act regulations, PointClickCare could simply have denied RTMS *any* access *at all* to its system. *Id.* § 171.204(a)(4)(i)-(ii) ("not fulfilling a request to access, exchange, or use electronic health information … will not be considered information blocking when" the "[m]anner exception [is] exhausted"). Nevertheless,

12

PointClickCare continued to allow RTMS's human users to access its system with logins that were not associated with bot use.  *See* JA998 (finding that PointClickCare's CAPTCHAs blocked only "some of [RTMS]'s user IDs").  Because offering those federally standardized manners of access sufficed as a matter of law, RTMS's no-sufficient-alternatives argument fails.

* * *

Where, as here, an EHI custodian and a requestor cannot reach agreement on terms governing the export of EHI, federal law identifies standardized manners of providing that EHI that suffice as a matter of law.  PointClickCare offered those manners of access to RTMS and its actions are thus "reasonable and necessary" under the Cures Act.

## B.    Without a Cures Act violation, the district court's injunction must be lifted.

Because both state law claims on which the district court relied are premised on a purported Cures Act violation, the district court erred as a matter of law in concluding that RTMS was likely to succeed on the merits of its claim.  *See* PCC Br. 32-33.  RTMS has no answer, instead seeking to shift the Court's focus away from that straightforward legal

reality with hyperbolic *ad hominem* attacks. *E.g.*, RTMS Br. 5 (accusing PointClickCare of "cowardice").

The district court recognized that the only way RTMS could succeed on its tort claims was if the Cures Act prohibited PointClickCare from blocking RTMS's bots. *E.g.*, JA1007, JA1016. Both of RTMS's tort claims are expressly premised on such an alleged Cures Act violation. JA40-41 ¶¶ 132-34; JA43-44 ¶¶ 153-54.

RTMS argues that its claims should stand regardless of whether the Cures Act bars or allows PointClickCare's conduct. RTMS Br. 27. That assertion is at war with RTMS's complaint—and it is legally wrong to boot. The district court found RTMS's unfair-competition claim "depends on" the purported Cures Act violation. JA1007. RTMS's tortious-interference claim, meanwhile, requires it to show "that the actions undertaken were 'wrongful,'" *Baron Fin. Corp. v. Natanzon*, 471 F. Supp. 2d 535, 541 (D. Md. 2006) (quoting *Martello v. Blue Cross & Blue Shield of Md., Inc.*, 795 A.2d 185, 193 (Md. Ct. Spec. App. 2002)). Because the Cures Act's manner exception authorized the conduct at issue—which required a finding that the conduct is both "reasonable and necessary"—

that conduct cannot also be wrongful. RTMS therefore cannot succeed on either claim.

## C. The district court's misinterpretation of the Cures Act raises grave constitutional issues.

The district court should have interpreted the Cures Act to avoid the risk that its injunction or the Cures Act itself would constitute a taking without just compensation in violation of the Fifth Amendment. PCC Br. 53-57; *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018) (directing courts to avoid statutory constructions that "raise[] serious constitutional doubts"). The district court should instead have opted for the "fairly possible" interpretation of the Cures Act that avoided those constitutional concerns. *United States v. Hansen*, 599 U.S. 762, 781 (2023). RTMS's response to this point (at 47-48) is unconvincing.

***First***, RTMS contends that PointClickCare should not be allowed to exercise the basic property right of exclusion against RTMS because RTMS is not an "unauthorized user." RTMS Br. 47.[3] RTMS is wrong.

---

[3] Indeed—perhaps having come to the belated realization that each of its data raids may be a federal felony—RTMS offers the repeated assertion (at 4, 11, 12, 22, 48) that its use of bots to access PointClickCare's system is "authorized." *See* 18 U.S.C. § 1030(a)(2), (c)(2)(B)(i) ("exceed[ing] authorized access" to a protected computer

15

As RTMS concedes (at 7), it may access PointClickCare's systems *only* through logins provided to it by PointClickCare's nursing-facility customers. Those facilities' contracts with PointClickCare bar bot use. JA995. As a sublicensee, RTMS's authorization cannot exceed the authorization PointClickCare grants to the direct licensee—the nursing facility. *See, e.g.*, *Syndia Corp. v. Lemelson Med., Educ., & Rsch. Found., Ltd. P'ship*, 165 F. Supp. 2d 728, 753 (N.D. Ill. 2001) (a licensee "could not, as a matter of law, have granted to any third parties rights greater than they held themselves"). So while care facilities may authorize RTMS to use the system in the same way the care facility's employees do, it is expressly *not* authorized to run bots on PointClickCare's system.

RTMS also falsely asserts that it "accesses patients' EHRs in the same manner as authorized employees of" nursing facilities. RTMS Br. 7; *see also id.* at 4 (contending that RTMS's access is "performed in the same manner as SNFs' access"). As the district court recognized, RTMS's bots "pull[] significantly more data from PCC than a human user can." JA1002 n.4. It is that nonstandard, automated, rapid-fire access

---

system "for … private financial gain" is a felony). No matter how often RTMS repeats that assertion, it is wrong.

16

that endangers PointClickCare's systems—which is why PointClickCare bars nursing-facility customers from employing it.  *See* PCC Br. 17-19.

***Second***, RTMS contends (at 48) that "[a]n unconstitutional taking must involve the government taking private property."  But the Takings Clause is not implicated only when the government takes property for itself.  A regulation is a taking when the government's action "appropriates for the enjoyment of third parties the owners' right to exclude."  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021).  RTMS's entire argument is that federal and state law require PointClickCare to provide RTMS unrestricted access to PointClickCare's own system using automated methods PointClickCare has chosen to forbid because of the danger and disruption they cause.  That is a taking.

To the extent RTMS's argument is that no "private property" is at issue, PointClickCare explained that the injunction invades several of its property interests, including (1) PointClickCare's right to exclude and prevent RTMS from trespassing on its system; (2) PointClickCare's contractual rights under its agreements with the nursing facilities; and (3) PointClickCare's copyright interest in the selection and arrangement of data in the reports RTMS loots from PointClickCare's systems.  PCC

17

Br. 53-57.   A taking of any of those property rights requires just compensation.   U.S. Const. amend. V.

*Third*, and relatedly, RTMS argues that it should be allowed to copy those copyrighted elements because "the information stored on PCC's systems does not belong to PCC."   RTMS Br. 48.   RTMS fundamentally misunderstands the argument.   There is no dispute that PointClickCare does not own the *EHI* stored on its system.   *See* PCC Br. 24 ("PointClickCare does not own the EHI stored on its platform.   In fact, PointClickCare's customer contracts explicitly reject any ownership claim.").   But PointClickCare *does* own a copyright in the selection and arrangement of data in particular reports.   PCC Br. 55-56; *see Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348 (1991) (copyright subsists in "choices as to selection and arrangement").   RTMS "pulls most patient clinical data through generating 'reports.'"   JA995 (quoting JA456).   PointClickCare, as the owner of the copyright in the selection and arrangement of data in those reports, has the "exclusive right[] … to reproduce" those selections and arrangements "in copies."   17 U.S.C. § 106(1).   PointClickCare may choose to license that exclusive right to nursing facilities, but as with any other grant of license, it is also free to

18

impose limits on that grant. Here, it has done so by barring automated bots—a license term RTMS continually violates.

Because the district court's chosen construction of the Cures Act poses these significant constitutional concerns, and because there is a better, more plausible, construction that avoids them, this Court should reject the district court's view of the law. *Hansen*, 599 U.S. at 781.

**D.    The IT performance and security exceptions further confirm that PointClickCare's bot prohibition is lawful.**

**1.**  Under the IT performance exception to the Cures Act's definition of information blocking, a custodian may "take action against a third-party application that is negatively impacting the health IT's performance," 45 C.F.R. § 171.205(b), including by "deny[ing] access" to that application, 85 Fed. Reg. at 25,874. *See* PCC Br. 45-46. RTMS does not dispute that bots—including RTMS's bots—are "third-party application[s]." RTMS concedes (at 24) that PointClickCare presented evidence that showed "'slow' data retrieval … tied to RTMS's activity." *See also* JA1003 (evidence showed "bot-related performance problems"). And PointClickCare provided uncontroverted evidence that it blocked *all* users whose accounts repeatedly showed bot activity. JA234-256,

JA1099-1106.    No more was required to bring PointClickCare's bot prohibition within the scope of the IT performance exception's authorization to deny access to third-party applications.

The district court improperly required more, including a showing of "complete system outages."  JA1009.  RTMS nowhere disputes that this was error—nor could it, because the IT performance exception imposes no such requirement.  All that exception requires is an "adverse[] impact" on the system—which RTMS concedes its bots had.  RTMS Br. 24.

RTMS appears to contend that PointClickCare should be required to buy more server space so that RTMS can run its unauthorized third-party applications on PointClickCare's system without system degradation, complaining (at 25) that "PCC's server space [is] limited by PCC's internal decision-making."  But RTMS can point to nothing in federal or state law that requires an EHI custodian to invest substantial sums of money to augment server space so that third parties can exceed their authorized use of the system.  PointClickCare allocates server space based on its contractual obligations to nursing homes—obligations to have a system available to human users.  The record is plain that PointClickCare provides more than enough server capacity to ensure

20

system continuity for human access, which is what the contracts contemplate and require. In short, RTMS's complaint that PointClickCare's servers are not sufficient to accommodate RTMS's unauthorized bot attacks is like pointing out that a restaurant drive-through does not accommodate private jets: even if true, it is legally irrelevant.

Just like RTMS, PointClickCare must make decisions about how to address certain risks. PointClickCare reasonably chose to address the risk of system slowdowns and outages occasioned by third-party applications engaged in nonstandard and potentially malicious access with a contractual bar on the use of automated software, and a technical procedure (unsolvable CAPTCHAs presented to bot-using accounts) that enforces that bar. Indeed, RTMS concedes that its need for free access to PointClickCare's system through unauthorized bot use is based on RTMS's own "internal decision-making"—it *could* employ more full-time employees to collect the data, RTMS Br. 25, 42, but it *chooses* not to.

**2.** The security exception also authorizes PointClickCare to bar bot access. *See* 45 C.F.R. § 171.203. RTMS does not dispute that bots, because of their ability to exfiltrate massive amounts of data quickly or

to perform other malicious actions faster than a human can respond, present a greater security risk than human users. *See* PCC Br. 50. And that is why PointClickCare bans *all* customers and their agents from using bots on its system, including the bots RTMS employs. PointClickCare presented unrebutted evidence that its bot bar reaches far beyond RTMS. JA1532-1547.

In response, RTMS harps on the district court's incorrect findings concerning PointClickCare's head of software-as-a-service platform operations, Bachar Fourati. There is little to these arguments—for example, RTMS contends that Mr. Fourati could not "identify … security protocols that RTMS has bypassed," but RTMS admitted, and the district court accordingly found, that it employs human users to get around PointClickCare's anti-bot CAPTCHA protocols. JA996; RTMS Br. 24.

These quibbles, moreover, largely miss the point, which is that because *all* bots are *potentially* harmful, PointClickCare may—under the security exception—decline to allow *any* of them to operate on its system. And that testimony was not only from Mr. Fourati, but also from Robert Boyle—about whose testimony the district court expressed no concerns. JA638-641. PointClickCare's anti-bot policy is the solution it has arrived

at to protect "the confidentiality, integrity, and availability of" the EHI it safeguards, 45 C.F.R. § 171.203(a). PointClickCare has reached the conclusion that no other solution will do. § 171.203(e)(1). Its unsolvable CAPTCHAs, directed at user IDs that show *repeated* bot activity, are "tailored to the specific security risk" posed by bots. § 171.203(b). And PointClickCare presented unrebutted evidence that it implements its bot bar without discriminating among bot users. JA1532-1547; *see* 45 C.F.R. § 171.203(c). PointClickCare's watch list shows that only a small percentage of blocked users are from RTMS. JA1532-1547. RTMS does not identify any "reasonable" or "appropriate" alternatives that address the problem of bots, *see* § 171.203(e)(2); instead, it contends, in essence, that it must be allowed to run bots *regardless* of the risks they pose because it believes that its bots are harmless, *e.g.*, RTMS Br. 12.

RTMS repeats insinuations about the timing of PointClickCare's imposition of CAPTCHAs, but the more plausible—indeed, obvious— explanation is that information security is a field in which risks change over time, and companies' responses to them necessarily follow suit. Accordingly, the mere fact that RTMS's bots may have been allowed to operate—or, rather, that RTMS was previously able to overcome

PointClickCare's bot-blocking tools—is of no moment.  PointClickCare's duty to safeguard patients' sensitive EHI outweighs RTMS's unjustified business reliance on permanent, no-cost access to systems it does not own through means those systems' owners have expressly forbidden.

## II.   The State-Law Claims Cannot Provide an Alternative Basis to Support the Injunction.

**A.**  RTMS's state-law claims independently fail because the Cures Act cannot serve as the basis of a Maryland tort claim.  PCC Br. 57-60.  Maryland law authorizes tort claims for statutory violations only where those claims are not inconsistent with the statute.  RTMS concedes that the Cures Act does not provide a private right of action.  RTMS Br. 32.  Although this does not necessarily bar a plaintiff from relying on a violation to support a tort claim, *id.*, a violation of a federal law does not inherently give rise to a Maryland tort claim, *see, e.g.*, *Waypoint Mgmt. Consulting, LLC v. Krone*, 2022 WL 2528465, at *61 (D. Md. July 6, 2022) (explaining that "even assuming defendants' conduct amounts to a violation of [a securities regulation], this cannot, on its own, establish defendants' liability as a matter of Maryland law"); *Makovi v. Sherwin-Williams Co.*, 561 A.2d 179, 190 (Md. 1989) (rejecting tort claim premised on employment discrimination prohibited by Title VII).

24

RTMS further does not dispute that Maryland law, consistent with the Restatement, allows a private tort cause of action based on a statutory violation only where doing so is not inconsistent with legislative intent. PCC Br. 58-59. Indeed, RTMS cites the Restatement with approval. *See* RTMS Br. 21-22. Determining whether a tort remedy is consistent with legislative intent requires considering the nature of the legislative provision, the adequacy of existing remedies, the extent to which a tort action will interfere with other means of enforcement, the purpose behind the legislative provision, the extent of the change in tort law, and the burden that a new cause of action will place on the judiciary. *See* Restatement (Third) of Unfair Competition § 1, cmt. a (1995); Restatement (Second) of Torts § 874A, cmt. h (1979).

Allowing a party to sue in tort for a purported violation of the Cures Act is inconsistent with Congress's legislative scheme. PCC Br. 60-61. The statute gives HHS power to define what is and is not information blocking. Its enforcement regime does not include private rights of action and underscores the purpose of balancing interoperability with privacy, security, and feasibility. Allowing tort claims based on the Cures Act would create a massive shift in the law and open the courthouse doors to

25

any party displeased with a company's security protocols. *See id.* Enforcement of the Cures Act is intentionally placed solely in the hands of federal agencies, not in the arsenal of business competitors.

Like the district court, RTMS fails to explain how its tort claims are consistent with the Cures Act's enforcement scheme or why it will not inundate courts with complex healthcare-information security issues. *See* RTMS Br. 30-38. RTMS argues that the absence of a private right of action in federal law means that RTMS should be able to sue in tort and points to a trilogy of employment law cases for support. *See id.* at 33-35. But those cases merely underscore that a violation of federal law does not inherently give rise to a tort claim. *Id.* Although those cases considered the availability of remedies, they did so in the context of the "'unvindicated public policy mandate' element of an abusive discharge cause of action." *Magee v. DanSources Tech. Servs., Inc.*, 769 A.2d 231, 257 (Md. Ct. Spec. App. 2001). This is not an abusive-discharge case, so the public policy mandate in those cases is inapplicable. If anything, those cases make plain that a court must seriously grapple with the underlying federal law and its public policy before allowing a tort claim to move forward. The district court did not do so.

RTMS thus pivots to argue that there is no problem with its claims here because they rest not only on the violation of the Cures Act but also on "qualitatively different" conduct.  RTMS Br. 37.  Not so.  The district court found that "[a]t its core, Real Time alleges that PCC has deployed indecipherable CAPTCHAs … to halt Real Time's business," which it ruled "amounts to 'information blocking' of protected patient medical records in violation of the 21st Century Cures Act."  JA1007.  The district court is correct that RTMS's claims hinge on whether PointClickCare has an obligation to provide health information to RTMS in the manner RTMS wants it.  JA40-41 ¶¶ 132-34; JA43-44 ¶¶ 153-54.  Whether that obligation exists is determined by the Cures Act.

As a last resort, RTMS appears to advance a new argument—that RTMS can sue PointClickCare even if PointClickCare's actions fit within the express confines of federal law.  *See* RTMS Br. 36-38.  That is wrong.  In the Cures Act, Congress explicitly acknowledged that its broad "information blocking" statutory text would reach too far, barring essential activities.  Congress thus instructed HHS to promulgate a rule identifying activities that, because they are "reasonable and necessary," may not be proscribed by law.  42 U.S.C. § 300jj-52(a)(3).  Exercising his

lawful authority, HHS determined that eight activities—including those covered by the manner exception, the IT performance exception, and the security exception—are "reasonable and necessary" for a national health-records system to function. *See* 85 Fed. Reg. at 25,755. Because PointClickCare's actions here are the ones HHS chose to authorize as "necessary" activities, they cannot form the basis of liability under state law. Maryland cannot ban activities that federal law "considers essential." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 156 (1982); *see also Moser v. Ford Motor Co.*, 28 F. App'x 168, 171 (4th Cir. 2001) (per curiam) (tort law claim preempted because it "would frustrate the Department of Transportation's goal of promoting a variety and mix of passive device"). RTMS is not likely to succeed on its state-law claims.

**B.** The tortious interference claim also fails because RTMS did not show that PointClickCare restricted bot-associated usernames "with the unlawful purpose to cause … damage" to RTMS. *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353-54 (4th Cir. 2013); PCC Br. 62-65. Once again, RTMS has no response. It acknowledges that it must establish that PointClickCare acted with the "purpose of injuring RTMS," but it points to no finding by the district court or evidence making that showing.

28

RTMS Br. 39.  In fact, the evidence shows that PointClickCare included a no-bot clause in its standard agreement with *all* nursing facilities, *see* JA995; that PointClickCare enforced this provision by placing *all* user IDs pulling high volumes of data on a watch list, and that *all* such user IDs showing continued bot usage then faced CAPTCHAs that would become unsolvable, JA1002, JA1010; and that before this litigation, PointClickCare did not know which user IDs PointClickCare's customers assigned to RTMS users and thus could not have targeted RTMS, JA710.

Like the district court, RTMS contends that it is enough that PointClickCare knew that its action would result in harm to RTMS. RTMS Br. 39.  But the law demands more.  "[A]cting to pursue one's own business interests at the expense of others is not, in itself, tortious." *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994).  Because nothing in the record shows that PointClickCare's use of CAPTCHAs was "directed" at RTMS's economic relationships, *Interphase Garment Sols., LLC v. Fox Television Stations, Inc.*, 566 F. Supp. 2d 460, 465 (D. Md. 2008), RTMS failed to establish likelihood of success on its tortious interference claim.

**C.** The unfair-competition claim is likewise defective because there is no evidence of fraud or deception. PCC Br. 65-66. RTMS argues in response that "[n]either fraud nor deceit are required to prevail." RTMS Br. 21. But even RTMS later admits that fraud and deception are the heart of this claim. *See id.* Underscoring this point, the Maryland case on which RTMS relies, in fact, reversed an injunction based on unfair competition where "the lower court" made "no direct finding of fraud or deception." *Mascaro v. Snelling & Snelling of Balt., Inc.*, 243 A.2d 1, 11-12 (Md. 1968). The Court should likewise reverse the injunction here. PointClickCare's contracts have long prohibited bots on PointClickCare's system. That RTMS has violated those terms and circumvented PointClickCare's enforcement efforts for years does not give RTMS a right to keep doing so. Nor is RTMS's complaint that these terms amount to an anticompetitive land-grab by PointClickCare well founded. Three of RTMS's direct competitors contract with PointClickCare. JA835. If any actor is engaged in misconduct, it is RTMS, not PointClickCare.

## III. The Remaining Preliminary Injunction Factors Favor PointClickCare.

**A.** RTMS's brief confirms RTMS's failure to show irreparable harm. The district court cursorily concluded that the "continued use of

indecipherable CAPTCHAS presents a real and imminent threat to the company's continued ability to do business." JA1017. But RTMS concedes that it had a variety of ways to avoid business disruption: It could have hired more people to access PointClickCare's system and the EHI on it, for example. RTMS Br. 42. Or RTMS could have accepted the alternative manner of receiving EHI prescribed by federal law. *See* 45 C.F.R. § 171.301. Those alternatives might have been less convenient for RTMS, but "extra inconvenience" does not "rise[] to the level of irreparable harm." *Molloy v. Metro. Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996). Injuries RTMS may suffer "in terms of time, money and energy expended in the absence of an injunction [are] not enough to support a finding of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 235 (4th Cir. 2017).

The district court further erred by accepting RTMS's conclusory testimony in lieu of admissible evidence such as financial documentation. PCC Br. 67-68. RTMS has no response, acknowledging that the only evidence of harm was its own unvarnished say-so. RTMS Br. 49. A preliminary injunction, however, requires more. *Braintree Labs., Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42 (1st Cir. 2010).

31

**B.** The balance of equities and public interest also weigh heavily against an injunction.

*First*, the injunction exposes more than a million patients to serious risk. PCC Br. 68-69. RTMS argues (at 51) that the only evidence of harm to patients concerned the cessation of RTMS's data analytics. Not so. Even with all ordinary protective tools at PointClickCare's disposal, the district court acknowledged that RTMS's bot usage had managed to slow data retrieval from PointClickCare's system. *See* JA1003. The court further referenced testimony at the hearing that PointClickCare has "experienced many incidents of performance degradation and complete outage[s]." JA1003 (quotation marks omitted) By stripping PointClickCare of its means of stopping RTMS's bots when they overwhelm PointClickCare's system, the district court has placed the system—and the lives of the patients whose care relies on it—at risk.

*Second*, the injunction jeopardizes the privacy and integrity of patient EHI. PCC Br. 69-70. Malicious actors are a serious threat, and the district court's injunction—entered on a public docket and further

32

publicized by RTMS's law firm[4]—all but advertises RTMS's user IDs to malicious actors who want to run bots for nefarious purposes without interference.  PCC Br. 69-70.  RTMS responds only that this argument opens the door to PointClickCare blocking all authorized users from its system.  RTMS Br. 41.  But PointClickCare *does* block all authorized users *from using bots* on its system, in part because of the potential for damage if a malicious actor gains access.  A malicious actor employing RTMS-style bots could wreak havoc on the system and rapidly steal, modify, or even delete records in numbers that, in RTMS's own words, would otherwise "require 450 full-time employees working 7 days a week" to manipulate.  RTMS Br. 42.  PointClickCare must have all tools at its disposal to stop such risks to EHI privacy and security.

*Third*, the injunction violates the statutory scheme Congress created and infringes PointClickCare's constitutional rights.  PCC Br. 54-55, 70.  RTMS's theory that it is entitled to deploy bots on PointClickCare's system defies the Constitution and federal law and regulations.  *See* Section I, *supra*.  Although RTMS may be entitled to

---

[4] *See* Jared Foretek, *Judge Blocks Medical Records Co.'s Anti-Bot Captchas*, RWLLaw.com (July 29, 2024), https://tinyurl.com/bdeers27.

access EHI, it has no right to run unauthorized software on PointClickCare's system. The Takings Clause protects PointClickCare from being required to give third parties access to its property. PCC Br. 53-57. Enforcing the law and "upholding constitutional rights is in the public interest." *Legend Night Club v. Miller*, 637 F.3d 291, 303 (4th Cir. 2011).

## CONCLUSION

For these reasons and those in its opening brief, PointClickCare asks the Court to reverse and vacate the injunction.

Respectfully submitted,

William C. Jackson
GOODWIN PROCTER LLP
1900 N Street NW
Washington, DC 20036

Nicole Bronnimann
KING & SPALDING LLP
1100 Louisiana Street
Suite 4100
Houston, TX 77002

*/s/ Jeremy M. Bylund*
Rod J. Rosenstein
Jeremy M. Bylund
 *Counsel of Record*
Amy R. Upshaw
Joshua N. Mitchell
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
jbylund@kslaw.com

*Counsel for PointClickCare Technologies Inc.*

November 15, 2024

34

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7), because it contains 6,475 words, excluding the parts of the motion exempted by Fed. R. App. P.32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

Date: November 15, 2024

*/s/ Jeremy M. Bylund*
Jeremy M. Bylund

*Counsel for PointClickCare Technologies Inc.*